UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Mayo Foundation for Medical Education and Research,<br><br>Plaintiff,<br><br>v.<br><br>Knowledge to Practice, Inc.,<br><br>Defendant. | Case No. 21-cv-1039 (SRN/TNL)<br><br><br>**Order** |

Andrew B. Brantingham, Alan J. Iverson, and Donna Reuter, Dorsey & Whitney LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for Plaintiff.

Anthony R. Zeuli, Elisabeth S. Muirhead, and Gregory C. Golla, Merchant & Gould, 150 South Fifth Street, Suite 2200, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Plaintiff Mayo Foundation for Medical Education and Research's ("Mayo") partial Motion to Dismiss Counterclaims of Defendant Knowledge to Practice, Inc. ("K2P") [Doc. No. 25]. Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court **grants in part** and **denies in part** that motion.

I.   BACKGROUND

   A.   The Parties

Mayo is a Minnesota non-profit corporation with its principal place of business in Rochester, Minnesota. (Countercl. ¶ 2.)

1

K2P is a Delaware corporation with its principal place of business in Bethesda, Maryland. (*Id.* ¶ 1.)

### B. Factual Background

#### 1. K2P's Founder

Mary Ellen Beliveau founded K2P on January 4, 2014. (*Id.* ¶¶ 3[1], 13.) Prior to founding K2P, Beliveau "was the Chief Learning Officer at the American College of Cardiology" where she "was responsible for design, development and implementation of curriculum designed to support the continuous professional development of cardiologists across the globe." (*Id.* ¶¶ 4–5.) In 2013, she began developing a new business concept "that could provide accredited continuing medical education and board review courses for physicians entirely online, without the need to travel to an in-person lecture, and in combination with in-person lectures." (*Id.* ¶ 9.)

#### 2. Mayo Contacts Beliveau

Mayo contacted Beliveau in 2013 about her new business concept, inquiring whether she might submit a proposal to "convert Mayo's in-person board review courses . . . into a blended in-person course that integrated online learning components," and improve its in-person lectures. (*Id.* ¶¶ 10–11.) Given Mayo's interest, Beliveau resigned from the American College of Cardiology and started K2P. (*Id.* ¶¶ 12–13.)

K2P and Mayo entered their first contract on April 14, 2014. (*Id.* Ex. 19 ("2018 Master Agreement") Recitals.). Pursuant to that contract, Mayo detailed each project's

---

[1]  The Counterclaim repeats paragraphs 3–5. The Court's citations to paragraphs 3–5 refer to those under the "Facts" section of the Counterclaim.

2

scope by issuing a Statement of Work ("SOW") that governed each respective project. (*See* Countercl. ¶¶ 29, 33; *see also* 2018 Master Agreement §§ 1.1–1.4.)

### 3. K2P's First Project for Mayo

K2P's first Mayo project focused on developing a Live Blended[2] Cardiovascular Board Review Course ("Cardiovascular Course"). (Countercl. ¶¶ 16, 23–24.) K2P began by auditing Mayo's pre-existing in-person cardiovascular course. (*Id.* ¶ 18.) Based on findings from its audit, K2P made recommendations to Mayo relating to design, assessments, curriculum, organization, learning objectives, and teaching points. (*Id.* ¶¶ 17–20.) K2P also "provided faculty training and individual guidance" to help them "gain knowledge and the ability to apply adult learning theory." (*Id.* ¶ 21.) After implementing these changes, the Cardiovascular Course was finalized and available for purchase on the K2P Platform[3] in June 2014. (*See id.* ¶¶ 23–24.)

This blended Cardiovascular Course paved the way for an Online Course in 2015. (*See id.* ¶ 26.) The Cardiovascular Course "was very successful" and Mayo acknowledged that K2P had helped create "a state of the art online educational program which incorporates all the updated adult learning principles and will truly improve the competence of the learners." (*Id.* ¶¶ 27–28.)

---

[2]   "Live Blended Course(s)" integrate "Mayo Live Courses and online learning components." (2018 Master Agreement § 1.4.)

[3]   K2P Platform is an online interface that is defined as "K2P's proprietary platform which provides personalized learning to the K2P End User . . . ." (2018 Master Agreement § 1.4.)

Mayo also hired K2P to convert three cardiovascular subspecialty in-person courses into Live Blended and Online Courses. (*See id.* ¶¶ 29–31.) After repeating a similar process of auditing and making recommendations, they too were launched on K2P's Platform. (*Id.*)

### 4. The 2018 Master Agreement

On November 1, 2018, K2P and Mayo entered into the 2018 Master Agreement. (*Id.* ¶ 89.) Under the 2018 Master Agreement, K2P agreed "to grant and Mayo agree[d] to accept a license to use certain of K2P's Course Support Services[4] and licensing of K2P Platform," while Mayo agreed "to grant and K2P agree[d] to accept a license to use Mayo Content." (*Id.* § 1.1.)

---

[4] "Course Support Services" is defined as "the combination of any of the following services and K2P Content during the Term of this Agreement: K2P Instructional Design; the integration of content and blending of traditional classroom instruction with online features and functionality and the course management; Development Services; K2P Product Marketing; K2P Marketing Plans; K2P Mayo Marketing Support; Enrollment Services; sales and distribution of Online Courses and Derivative Works; and the hosting, maintenance and development [of] the K2P Platform." (2018 Master Agreement § 1.4.)

4

The parties defined many terms in the 2018 Master Agreement. Notably, the 2018 Master Agreement defined "Confidential Information,"[5] "K2P Intellectual Property,"[6] and "K2P Content,"[7] along with K2P's various services. (*Id.* § 1.4.)

The Master Agreement also granted Mayo a "license for use, access, and benefit of the K2P Platform by Authorized Users during the term as specified in a SOW." (*Id.* § 4.1.) In exchange, "Mayo agree[d] to pay K2P for Course Support Services & Platform Licensing in accordance with the fee schedule set forth in each applicable SOW." (*Id.* § 7.1.) Likewise, K2P agreed to "pay to Mayo, on a quarterly basis, the Royalties that accrue from the net amounts it collects from the Online Courses and Derivative Works." (*Id.* § 5.)

The parties also agreed to an exclusivity provision. (*See id.* § 6.) In particular, K2P agreed not to deliver "any board review stand-alone Online courses for those medical specialties defined in an SOW by any other provider via the K2P Platform." (*Id.*) Mayo

---

[5] "Confidential Information" is defined as "all information relating to the business, customers or affairs of a Disclosing Party . . . including but not limited to, all trade secrets, proprietary, intellectual property or confidential information in whatever form that is disclosed under this Agreement that is not generally known to the relevant industry or industry segment . . . ." (2018 Master Agreement § 1.4.)

[6] "K2P Intellectual Property" is defined as "individually or together K2P Course Support Services, K2P Content, K2P Online Course, K2P Platform, K2P Instructional Design, Derivative Works and K2P End Users." (2018 Master Agreement § 1.4.)

[7] "K2P Content" is defined as "any Content developed or provided by or on behalf of K2P for incorporation into or used in connection with the Online Courses, Course Support Services, Documentation or Derivative Works," including "any K2P Content that is in existence as of the Effective Date or is developed by the employees or agents of K2P during the course of the Development Services." (2018 Master Agreement § 1.4.)

agreed "not to distribute or license to any third party the right to distribute the Mayo Content defined between the parties in an SOW in any Live Blended or Online Course in the United States." (*Id.*)

The 2018 Master Agreement addressed the parties' intellectual property rights as well. (*Id.* § 8.) Under Section 8, Mayo retained exclusive ownership of "all Mayo Content, Mayo Live and Live Blended Courses and the Intellectual Property Rights relating thereto." (*Id.* § 8.1.) Similarly, K2P retained ownership over "all K2P Intellectual Property and their [I]ntellectual Property Rights relating thereto." (*Id.* § 8.2.) The agreement further provided that "[n]one of the Course Support Services, Online Courses or K2P Intellectual Property licensed to Mayo under the terms of this Agreement or SOWs shall be considered work made-for hire." (*Id.*)

The 2018 Master Agreement also governed the disclosure of Confidential Information. (*See id.* § 13.) K2P agreed to "only use the Mayo Content and Mayo Confidential Information for the purposes of providing the Course Support Services to Mayo, to fulfill its obligations to Mayo under this Agreement and to develop Online Courses and Derivative Works." (*Id.* § 13.5.) And Mayo agreed to "only use the K2P Intellectual Property or K2P Confidential Information for the purposes of advertising the Courses to potential end users and to fulfill its obligations under this Agreement." (*Id.*) Mayo further agreed to never "use nor share with 3rd parties, K2P Intellectual Property or K2P Confidential Information for its own purposes, including, but not limited to, product development, quality control, or research other than provided for in this Agreement." (*Id.*)

### 5. Mayo's Platform

In 2019, Mayo decided to develop its own online platform where it could host live blended and online courses. (*See* Countercl. ¶¶ 34–35.)

#### a. Mayo's Alleged Accesses to K2P's Platform

To create its own platform, Mayo hired a company called Corporate Web Services ("CWS"). (*Id.* ¶ 120.) Throughout 2018 and 2019, K2P alleges that Mayo employees "logged into K2P's Platform on multiple occasions for extended periods of time." (*Id.* ¶¶ 121–25.) K2P further alleges that Mayo "disclosed K2P Intellectual Property and Confidential Information to CWS for the purpose of replicating the K2P Platform and Online Courses." (*Id.* ¶ 126.)

K2P also contends that in 2019 Mayo "logged into K2P's Google AdWords account." (*Id.* ¶¶ 127–28.) When it did so, K2P alleges that Mayo obtained K2P confidential pricing and strategy information and, without authorization, canceled multiple K2P advertisements. (*Id.* ¶¶ 128–29.) K2P asserts that Mayo used that pricing information to outbid K2P in creating its own AdWords program, effectively leading potential customers away from the K2P Platform. (*See id.* ¶¶ 130–33.)

#### b. Mayo Launches its Platform

On November 25, 2019, Mayo began advertising its online platform. (*Id.* ¶¶ 34–35.) That same day, K2P e-mailed Mayo to express its concern that Mayo's platform used K2P Intellectual Property and to request "a preview walkthrough demo of the new courses in the hopes of alleviating that concern." (*Id.* ¶¶ 36–37.) Eight days later, Mayo presented a demonstration to K2P of one of the live blended courses. (*Id.* ¶ 38.) The demonstration

apparently confirmed K2P's concerns, prompting them to request a second demonstration of the online course, which occurred on December 15, 2019. (*Id.* ¶¶ 39–41.) As a result, K2P now alleges that Mayo's courses were "utilizing K2P Content and K2P Instructional Design and copying features and functions of the K2P Platform." (*Id.* ¶ 42.)

A series of communications between the parties regarding these concerns followed. (*Id.* ¶¶ 43–62.) Throughout this time, K2P repeatedly requested that Mayo delay launching its new platform and provide login credentials so that they could review the courses. (*Id.* ¶¶ 46, 53, 61.) Although Mayo refused to give K2P unfettered access, Mayo reviewed its offerings and made "visual updates" to the courses. (*See id.* ¶ 50; *see also* Compl. ¶ 40.)

Mayo launched its new platform on January 31, 2020. (*Id.* ¶ 63.) The platform offered the Cardiovascular Course, along with the three Cardiovascular Subspecialty Courses. (*See id.* ¶¶ 64, 81.) The parties do not dispute that the courses on Mayo's and K2P's platforms have many similarities. (*See id.* ¶¶ 65–87.) Instead, the parties dispute who owns and has the right to use the Cardiovascular and Cardiovascular Subspecialty Courses. (*Id.* ¶ 88.)

### C. Procedural History

Mayo filed the Complaint [Doc. No. 1] on April 23, 2021. Mayo seeks a declaratory judgment that the Cardiovascular Course, the Cardiovascular Subspecialty Courses, and an Internal Medicine Course are Mayo's exclusive property and that they do not infringe upon K2P Intellectual Property. (Compl. ¶¶ 52–56.) Mayo also alleges that K2P breached the 2018 Master Agreement by withholding royalties. (*Id.* ¶¶ 64–67.)

K2P answered and filed its counterclaim on June 28, 2021, asserting seven causes of action. (*See generally* Countercl.) Specifically, K2P asserts claims for declaratory judgment, breach of contract, breach of the duty of good faith and fair dealing, civil theft, conversion, tortious interference with prospective economic advantage, and unjust enrichment. (*Id.* ¶¶ 134–90.)

Mayo filed this partial motion to dismiss, seeking dismissal of five of those claims, namely, dismissal of the claims alleging breach of the duty of good faith and fair dealing, civil theft, conversion, tortious interference with prospective economic advantage, and unjust enrichment. (Partial Mot. Dismiss; *see also* Pl.'s Mem. [Doc. No. 27] ("Mayo Mem.") at 9–28.) In response, K2P voluntarily dismissed its conversion and tortious interference claims. (Def.'s Opp'n [Doc. No. 43] ("K2P Opp'n") at 1; Notice of Voluntary Dismissal [Doc. No. 42].) K2P opposes dismissal of the remaining claims. (*See generally* K2P Opp'n.)

## II.   DISCUSSION

### A.   Legal Standard

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the facts alleged in the complaint as true and views those allegations in the light most favorable to the plaintiff. *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). However, the Court need not accept as true wholly conclusory allegations or legal conclusions couched as factual allegations. *Id.* In addition, the Court ordinarily does not consider matters outside the pleadings on a motion to dismiss. *See* Fed. R. Civ. P. 12(d). Matters outside the pleadings include "any written or oral evidence in support of or in

opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings," as well as statements of counsel at oral argument that raise new facts not alleged in the pleadings. *Hamm v. Rhone-Poulenc Rorer Pharm., Inc.*, 187 F.3d 941, 948 (8th Cir. 1999) (internal quotation marks and citation omitted). The Court may, however, "consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record."[8] *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (internal quotation marks and citation omitted).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must allege facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

**B. Analysis**

Mayo seeks an order dismissing K2P's civil theft, breach of the duty of good faith and fair dealing, and unjust enrichment claims. Each cause of action is considered in turn.

---

[8] For purposes of this motion, the Court has considered the Complaint and the Answer and Counterclaims, and their attachments.

1.  **Civil Theft**

Mayo contends that a claim for civil theft is improper because the parties' property interests are defined by the 2018 Master Agreement, making K2P's exclusive remedy an action for breach of that agreement. (Mayo's Mem. at 18–19; Pl.'s Reply [Doc. No. 47] ("Mayo's Reply") at 3–6.)[9]  The Court agrees.

Under Minnesota's civil theft statute, "[a] person who steals personal property from another is civilly liable to the owner of the property for its value when stolen plus punitive damages."  Minn. Stat. § 604.14, subd. 1.  When an agreement defines the at-issue property rights of the parties and the ownership of those rights under the agreement are disputed, then the claim sounds in contract—not civil theft.  *4Brava, LLC v. Sachs*, Civ. Nos. 15-2743, 15-2744 (JRT/DTS), 2017 WL 1194195, at *22 (D. Minn. Mar. 30, 2017) (granting motion for summary judgment on civil theft claim because "the gravamen of the complaint is . . . breach of contract" (internal quotation marks omitted)).  This is because whether the civil theft claim succeeds or fails is dependent on whether the contract was breached.  *See id.* ("If the breach of contract claim fails, then DSC Products does not have a right to the property and no theft or conversion has occurred."); *see also Kalman v. Morris-N. Am., Inc.*, 531 So. 2d 394, 396 (Fla. Dist. Ct. App. 1988) ("[T]here can be no statutory civil theft where there is a contractual relationship between the parties."); *Fla. Power & Light Co. v.*

---

[9]  Mayo also argues that a civil theft claim does not apply to the type of intangible property at issue here and that K2P has failed to plausibly plead this claim. (Mayo's Mem. at 19–21; Mayo's Reply at 7–11.)  Because the Court dismisses the civil theft claim for the reasons stated above, it need not reach Mayo's alternative arguments for dismissal.

11

*Utilities Servs. of Am., Inc.*, 550 So. 2d 13, 14 (Fla. Dist. Ct. App. 1989) ("It is the non-existence of the contractual relationship, in fact, which allows the civil theft award to stand."); *Isleman v. Public Storage*, No. A20-0092, 2020 WL 6846352, at *5 (Minn. Ct. App. Nov. 23, 2020), *rev. denied* (Feb. 16, 2021) ("[W]hen a plaintiff seeks to recover damages for an alleged breach of contract [s]he is limited to damages flowing only from such breach except in exceptional cases where the defendant's breach of contract constitutes or is accompanied by an independent tort."); *First Integrity Bank, N.A. v. Ohio Cas. Ins. Co.*, Civ. No. 05-2761 (MJD/RLE), 2006 WL 1371674, at *6 (D. Minn. May 15, 2006) ("Minnesota law does not recognize an independent tort for conduct that merely constitutes a breach of contract.").

Here, K2P alleges that Mayo's employees stole K2P's personal property, including K2P Intellectual Property, K2P Confidential Information, K2P Content, K2P Instructional Design, K2P Platform, and K2P Product Marketing. As explained in *4Brava*, however, because ownership of these property rights is defined by contract, K2P's rights, if any, arise solely by means of the 2018 Master Agreement. Accordingly, K2P's remedy is an action for breach of contract. *See 4Brava*, 2017 WL 1194195, at *22 (granting summary judgment on civil theft claim when "the gravamen of the complaint is . . . breach of contract" (internal quotation marks omitted)).

But K2P contends that it also has a claim for civil theft because Mayo committed an independent tort when Mayo "stole its property." (K2P Opp'n at 19.) In urging the Court not to dismiss the civil theft claim, K2P focuses on the word "stole," asserting that stealing is an independent tort. (*Id.*) However, the Court focuses on the word "property."

Again, whether K2P owns any rights in "property" at issue in this case, that are capable of being "stolen," can only be determined by analyzing the 2018 Master Agreement under the law. Thus, the civil theft claim fails.

### 2. Breach of the Duty of Good Faith and Fair Dealing

Mayo argues that K2P's independent cause of action for breach of the duty of good faith and fair dealing must be dismissed because it is subsumed under the breach-of-contract claim. (Mayo's Mem. at 25–26; Mayo's Reply at 11–13.) The Court agrees.

In Minnesota, "every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract." *i-Sys., Inc. v. Softwares, Inc.*, Civ. No. 02-1951 (JRT/FLN), 2004 WL 742082, at *12 (D. Minn. Mar. 29, 2004) (internal quotation marks and citation omitted). The implied covenant "serves only to enforce existing contractual duties, and not to create new ones." *Clear Wave Hearing Instruments, Inc. v. Starkey Holding Corp.*, Civ. No. 11-1562 (DWF/SER), 2012 WL 949953, at *10 (D. Minn. Mar. 20, 2012) (internal quotation marks and citation omitted). Minnesota courts do "not recognize a cause of action for breach of the implied covenant of good faith and fair dealing separate from the underlying breach of contract claim." *Medtronic, Inc. v. ConvaCare, Inc.*, 17 F.3d 252, 256 (8th Cir. 1994).

Here, K2P's allegations in support of the claim for breach of the duty of good faith and fair dealing rely on the same conduct as the breach-of-contract claim. (*See* Countercl. ¶ 163 ("Mayo's actions constitute a breach of the covenant of good faith and fair dealing.").) Put differently, the implied covenant claim is subsumed under the breach-of-

contract claim, meaning that K2P may not maintain a separate cause of action for that claim under Count III, and, therefore, the Court dismisses it.

### 3. Unjust Enrichment

K2P alleges that Mayo was unjustly enriched when it stole K2P Intellectual Property and Confidential Information. (Countercl. ¶¶ 185–190.) Mayo argues that this claim must be dismissed because the 2018 Master Agreement governs their relationship. (Mayo's Mem. at 26–28; Mayo's Reply at 13–14.)

In Minnesota, an unjust enrichment claim is an equitable remedy that a plaintiff may not pursue when "there is an enforceable contract that is applicable." *Genz-Ryan Plumbing & Heating Co. v. Weyerhaeuser NR Co.*, 352 F. Supp. 3d 901, 906 (D. Minn. 2018) (internal quotation marks omitted). However, Federal Rule of Civil Procedure 8 expressly permits "a party to plead alternative or inconsistent claims or defenses." *Mono Advert., LLC v. Vera Bradley Designs, Inc.*, 285 F. Supp. 3d 1087, 1091 (D. Minn. 2018). For this reason, courts usually permit unjust enrichment claims to survive dismissal when plead in the alternative. *See, e.g.*, *id.*; *Motley v. Homecomings Fin., LLC*, 557 F. Supp. 2d 1005, 1014 ("Dismissal of the alternatively pleaded unjust-enrichment claim, therefore, would be inappropriate."); *Genz-Ryan Plumbing*, 352 F. Supp. 3d at 907 (permitting plaintiff "to plead unjust enrichment in the alternative to its breach of contract claim").

Here, K2P asserts that the unjust enrichment claim is an alternative argument to its breach-of-contract claim and that it addresses conduct that falls outside the 2018 Master Agreement. (K2P's Opp'n at 20–23.) At this stage of the litigation, the Court permits K2P to plead unjust enrichment in the alternative. But K2P will ultimately have to choose

whether it wants to proceed to trial under an unjust enrichment theory or a breach of contract theory. *See, e.g.*, *Asset Mktg. Servs., LLC v. JAM Prod., Inc.*, Civ. No. 19-cv-02113 (SRN/TNL), 2021 WL 3025885, at *1–2 (D. Minn. July 16, 2021) (dismissing the unjust enrichment claim prior to trial); *Lonesome Dove Petroleum, Inc. v. Holt*, 889 F.3d 510, 515 (8th Cir. 2018) (affirming summary judgment on unjust enrichment claim because the conduct was governed by a contract).

### III.    CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff Mayo Foundation for Medical Education and Research's partial Motion to Dismiss Counterclaims of Defendant Knowledge to Practice, Inc. [Doc. No. 25] is **GRANTED IN PART**, and **DENIED IN PART,** as follows:

1. The Court **GRANTS** the Motion to Dismiss Counts III and IV with prejudice;
2. The Court **DENIES** the Motion to Dismiss Count VII; and
3. The Court **DENIES** the Motion to Dismiss Counts V and VI as moot due to the Voluntary Dismissal by Knowledge to Practice, Inc. [Doc. Nos. 42, 43].

Dated: February 10, 2022                                                s/ Susan Richard Nelson
                                                                                        SUSAN RICHARD NELSON
                                                                                        United States District Judge