UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Mayo Foundation for Medical Education and Research, | Civil File No. 21-cv-1039 (SRN/TNL) |
| Plaintiff/ Counterclaim Defendant, | **MEMORANDUM OF LAW IN SUPPORT OF MAYO'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF MARK LANTERMAN (FILED UNDER SEAL)** |
| vs. | |
| Knowledge to Practice, Inc., | |
| Defendant/ Counterclaim Plaintiff. | |

Plaintiff and Counterclaim Defendant Mayo Foundation for Medical Education and Research ("Mayo") submits this Memorandum of Law in support of its Motion to Exclude the Testimony of Mark Lanterman, designated as an expert witness by Defendant and Counterclaim Plaintiff Knowledge to Practice, Inc. ("K2P").

## INTRODUCTION

The Court should exclude the testimony of Mark Lanterman because his disclosed opinions are not based on an application of computer forensic expertise to digital evidence. Lanterman proposes to testify that MedEd Manager, the learning management system ("LMS") used by Mayo to deliver online medical board review courses, contains features and functions similar to those of the K2P Platform. Lanterman also proposes to testify that "Mayo looked to the programmed functionality of K2P's platform to develop its own product." Ex. 1

("Rpt."),[1] ¶ 2. But Lanterman concedes his analysis did not involve a review of digital evidence that is beyond a layperson's understanding, such as "code, coded algorithms, or other 'back-end' information that is not [] observable by . . . a user." *Id.* ¶ 16. Instead, Lanterman's opinions are premised *in their entirety* on a "surface level" comparison of the two LMS platforms. *Id.* ¶ 31. Lanterman merely "observe[d] the similarities and differences" between MedEd Manager and the K2P Platform "as [those platforms] are presented to a user." *Id.*

Lanterman's observations regarding superficial characteristics of the parties' respective platforms are no more rigorous, scientific, or technical than any juror's observations would be upon reviewing the same evidence. Opinion testimony like Lanterman's that does not involve the application of specialized expertise is not helpful to the jury, risks misleading the jury, and in all events is inadmissible under Federal Rule of Evidence 702. Accordingly, the Court should grant Mayo's motion to exclude Mark Lanterman's proposed testimony in its entirety.

## FACTUAL BACKGROUND

### A. Nature of the Dispute[2]

In this breach of contract case, Mayo and K2P dispute the ownership of contractually-defined intangible property interests in medical board review courses developed and taught by Mayo physicians. In 2014, Mayo hired K2P to

---

[1] Unless otherwise indicated, citations to "Ex." refer to the exhibits to the Declaration of Nathan Ebnet in Support of Mayo's Motion to Exclude the Expert Testimony of Mark Lanterman.

[2] For the Court's convenience, Mayo will set forth only those facts relevant to this motion. Mayo otherwise incorporates by reference the factual background from its Motion for Summary Judgment filed concurrently with this motion.

provide consulting services in support of the courses, and subsequently granted K2P a license to distribute derivative versions of the courses online. ECF 117, ¶¶ 4–9. The parties ultimately collaborated on five courses: Cardiovascular Board Review, Internal Medicine Board Review, and three cardiovascular subspecialty courses. *Id.*

In 2018, Mayo informed K2P that it did not intend to renew the parties' contract for the three cardiovascular subspecialty courses. *Id.* ¶ 12. Mayo instead planned to distribute those courses on an updated version of a different LMS, MedEd Manager, which Mayo had used in connection with the courses before K2P's engagement. *Id.* ¶¶ 3, 15. Mayo engaged non-party Corporate Web Services, Inc. ("CWS") to update MedEd Manager. ECF 121, ¶ 6.

Following K2P's allegations of misappropriation related to, *inter alia*, Mayo's new versions of the subspecialty courses, Mayo initiated this lawsuit to seek clarity regarding the parties' respective rights. ECF 1, ¶¶ 41, 49–50. K2P filed counterclaims, alleging that the updated MedEd Manager misappropriated features and functionality of the K2P Platform. *See generally* ECF 17, ¶¶ 134–190.

### B.   Lanterman's Analysis and Report

To support its counterclaims, K2P hired Mark Lanterman, Chief Technology Officer of Computer Forensic Services ("CFS"), to evaluate the parties' respective web platforms and offer opinions on whether Mayo "incorporated specific features and functionality of K2P's platform into its own MedEd Manager platform." Rpt. ¶ 1. Lanterman conducted two analyses to arrive at his opinions.

First, Lanterman reviewed the parties' pleadings, written discovery, deposition transcripts, and related exhibits. *Id.* Ex. B. Lanterman described the emails he reviewed as remarking "upon K2P's features and functionality, and Mayo's desire to incorporate those functions into its own product." Rpt. ¶ 27. In his deposition, Lanterman confirmed that the purpose of his document and email review was to provide factual background. Ex. 2, at 63:19–21, 65:12–19, 147:20–23. Lanterman was not reviewing the evidence to expose hidden metadata or other information not readily apparent from the face of the documents. *Id.* at 62:25–63:21, 65:9–19.

Second, Lanterman received log-in credentials to the K2P Platform and MedEd Manager and compared the platforms "from the perspective of a user." Rpt. ¶ 14. Lanterman clicked around across the platforms and reviewed various pages, but only specifically compared the platforms' respective presentations of one of the five courses on which Mayo and K2P had previously collaborated. Ex. 2, at 109:15–110:12, 112:6–20, 114:7–115:20; Rpt. ¶ 31 n.2 (noting his comparison of K2P's "Mayo Clinic Interventional Cardiology Online Board Review" to Mayo's "2020 Interventional Cardiology Online Board Review"). Within this course, Lanterman took four screenshots comparing two pages on the platforms. Rpt. ¶ 34, figs. 1–3. Lanterman stated that the screenshots were "good demonstratives" of the platforms (Ex. 2, at 135:12–19), but admitted they only captured a small portion of the pages and information available online (*id.* at 136:6–137:2, 141:4–19). Lanterman did not review any "code, coded algorithms, or other 'back-end' information that is not necessarily observable by simply accessing the portals as

4

a user." Rpt. ¶ 16. Lanterman's comparison of the platforms was limited to "the features and functionality of the platforms at the surface level." *Id.* ¶ 31.

Based on his observations, Lanterman opines that Mayo and CWS "looked to the programmed functionality of K2P's platform to develop [Mayo's] own product, MedEd Manager." *Id.* ¶ 2. Lanterman notes that "as a matter of design, K2P's platform and MedEd Manager are visually different." *Id.* ¶ 32. Yet he concludes that "the K2P Platform was a directing force in the development of Mayo's updated MedEd Manager platform and provided the basis for Mayo's desired feature set." *Id.* ¶ 30. As restated at the close of his report, Lanterman proposes to testify that:

> "Because 1) Mayo communicated the functionality of K2P when developing MedEd Manager with its web development partner, and 2) there are significant functional similarities between MedEd Manager and K2P's platform, I conclude that without access to K2P's platform, Mayo and CWS would not have had a clear scope of what features and functionality to include in the MedEd Manager product. In other words, the functionality and features of MedEd Manager were not conceptualized nor designed from scratch."

*Id.* ¶ 35.

## LEGAL STANDARD

Expert testimony is admissible only when the proponent can demonstrate that (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact"; (b) that the expert's testimony is "based on sufficient facts or data"; (c) that the testimony is "the product of reliable principles and methods"; and (d) that the expert "reliably applied the principles and methods to

5

the facts of the case." Fed. R. Evid. 702.³ The proponent of expert testimony bears the burden to demonstrate the admissibility of an expert's testimony by a preponderance of the evidence. *See, e.g., Hoekman v. Educ. Minn.*, 335 F.R.D. 219, 236 (D. Minn. 2020).

Courts exercise a vital "gatekeeping role" when considering the admissibility of expert testimony under Rule 702. *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1000 (8th Cir. 2019) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). "The touchstone for the admissibility of expert testimony is whether it will assist or be helpful to the trier of fact." *Lee v. Andersen*, 616 F.3d 803, 808 (8th Cir. 2010) (quotation omitted). Accordingly, "[e]xpert testimony is appropriate when it relates to 'issues that are beyond the ken of people of ordinary experience.'" *United States v. Clapp*, 46 F.3d 795, 802 (8th Cir. 1995) (quoting *United States v. French*, 12 F.3d 114, 116 (8th Cir. 1993)).

## ARGUMENT

Mark Lanterman's opinions are inadmissible because they are not the product of scientific or technical knowledge, which Lanterman may indeed possess, but which he unquestionably did not apply in this case. To the contrary, Lanterman's opinions are based on a surface-level comparison of two websites, requiring no expertise beyond the capabilities of a layperson. Such testimony is

---

³ An amendment to Rule 702, clarifying the proponent's burden to demonstrate admissibility of expert evidence, is currently under consideration by the Supreme Court and, if approved, will take effect on December 1, 2023. Summary of Proposed New and Amended Federal Rules of Procedure (Oct. 19, 2022), https://www.uscourts.gov/sites/default/files/2022_scotus_package_0.pdf. Mayo's arguments are supported by the current version of Rule 702 and its proposed amendment.

inadmissible because it is not helpful to the jury and may be misleading or unfairly influential upon the jury.

### A. Lanterman Did Not Apply Any Computer Forensic Expertise or Methodology to Reach his Conclusions

Lanterman claims to "have over 30 years of experience in computer forensics and cybersecurity." Rpt. ¶ 3. For purposes of this motion only, Mayo does not contest Lanterman's purported expertise because, as explained below, Lanterman did not apply that purported expertise to arrive at his opinions in this case.

Lanterman's analysis, involving a review of communications between the parties followed by a surface-level comparison of two websites, is a far cry from the "computer forensics" and "digital forensics" work in which Lanterman claims expertise. Lanterman's company, CFS, defines computer or digital forensics as "the scientific process of capturing (imaging) and analyzing information stored in any electronic format, for the purpose of investigating allegations . . . ." *Services*, Computer Forensic Services, https://www.compforensics.com/services (last visited April 11, 2023). At his deposition, Lanterman explained the five types of "digital forensics" that he and his company perform: disk forensics, network forensics, internet forensics, cloud forensics, and email forensics. *See generally* Ex. 2, at 51:7–63:21. Lanterman agreed that his opinions in this case did not involve disk forensics, *id.* at 52:15–56:8, or cloud forensics, *id.* at 61:3–22.

Regarding the remaining three disciplines, Lanterman's protestations that he did, in fact, apply network, internet, and email forensics—merely by reading emails and interacting with the parties' websites in the same manner as a lay user

7

would—are belied by his own descriptions of those disciplines. According to Lanterman, network and internet forensics involve responding to denial of services attacks, analyzing user logs, tracking social media threats, and/or deploying "sniffers" or "tracers" to track internet activity. *Id.* at 56:9–58:22, 59:5–60:16. It is undisputed that Lanterman did not apply these techniques to the evidence in this case. *Id.* at 56:9–61:2; 103:17–23. Similarly, Lanterman described email forensics as an analysis of an email's metadata and other back-end information to determine whether it was manipulated or fabricated. *Id.* at 61:23–63:16. But in this case, Lanterman merely read various emails for context and factual background—like any juror could. *Id.* at 63:17–65:19. In other words, Lanterman's analysis in this case did not involve the five types of digital or computer forensics for which Lanterman claims expertise.

The non-technical nature of Lanterman's opinions is confirmed by Mayo's rebuttal expert, R. Cuyler Robinson. Based on his review of Lanterman's report and deep experience with computer forensics, Robinson concluded that "Mr. Lanterman's stated opinions generally do not appear to be based on computer forensic expertise, and his opinions lack the specificity and factual support customarily expected of expert opinion evidence in the field of computer forensics." Ex. 3 ("Robinson Rpt.") ¶ 25; *see also* Ex. 4, at 63:13–21.

**B.     Lanterman's Proposed Testimony is Not Helpful to the Jury**

Where, as here, the subject matter of expert testimony is within the knowledge or experience of any layperson, expert testimony is superfluous, unhelpful to the jury, and inadmissible as a result. *See, e.g., Clapp*, 46 F.3d at 802.

"There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be

8

qualified to determine intelligently . . . the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *Justice v. Carter*, 972 F.2d 951, 957 (8th Cir. 1992) (quoting Fed. R. Evid. 702 advisory committee's note). Lanterman's proposed testimony fails this test because his opinions are premised on reading email correspondence and making surface-level observations about two websites—areas plainly "within the jury's knowledge or experience." *Lee*, 616 F.3d at 808.

    Courts routinely exclude expert testimony that is the product of nothing more than surface-level comparisons. For example, in *Pelster v. Ray*, the court remanded for a new trial after concluding the trial court erred in allowing a purported expert to testify that cars' odometers were tampered with. 987 F.2d 514 (8th Cir. 1993). Like the visual comparison performed by Lanterman, the expert in *Pelster* offered only self-evident conclusions: "[A]ny lay person has the ability to compare the odometer readings on two titles, odometer statements, or check-in sheets and decide whether and when the vehicle's odometer had been rolled back." *Id.* at 526. Similarly, in *Paulson v. Plainfield Trucking, Inc.*, the court concluded that an expert could not "testify to things readily perceivable to the Jury from photographs, or other demonstrative aids." 2003 U.S. Dist. LEXIS 27776, at *11 (D. Minn. Nov. 21, 2003). Additionally, in *Plasti Dip International, Inc. v. Rust-Oleum Brands Co.*, the court excluded a marketing expert's proposed testimony about the apparent similarity between the contested trademarks' use of the letter "i" and root word "dip" because it was within the knowledge or experience of laypersons. 2017 U.S. Dist. LEXIS 32464, at *10–11 (D. Minn. Feb. 13, 2017).

Lanterman's opinions should be excluded on similar grounds because, by his own admission, his proposed testimony is the product of a surface-level comparison of the parties' websites, including the visual and functional properties readily observable by any layperson. *See, e.g.*, Rpt. ¶ 31.

Lanterman's opinions should also be excluded because they expressly adopt the perspective of an ordinary user of the two LMS platforms at issue. *See, e.g.*, Ex. 2, at 107:12–113:15 (describing Lanterman's "user view" comparison of the platforms). When experts adopt the perspective of an ordinary person and offer non-technical conclusions based on no specialized evidence or knowledge, their opinions are inadmissible. *See, e.g., Furnituredealer.net, Inc. v. Amazon.com, Inc.*, 2022 U.S. Dist. LEXIS 54510, at *34–35 (D. Minn. Mar. 25, 2022).

In *Furnituredealer.net*, the court excluded a marketing expert's proposed opinion that the textual descriptions of furniture at issue in a copyright infringement claim "ultimately had the same 'total concept and feel'" based on the expert's visual review. *Id.* The court concluded the proffered expert testimony was "simply not helpful to the trier of fact" because the allegedly infringing materials were "not so significantly technical that a reasonable person could not understand similarity of ideas or expression without specialized knowledge." *Id.* at *35–36. Likewise, in *Rottlund Co. v. Pinnacle Corp.*, the Eighth Circuit determined that an architectural expert should not have been allowed to testify about apparent similarities between the architectural designs at issue because the proposed testimony "added nothing helpful to the jury's

10

consideration" of the key question whether the defendant copied the plaintiff's work. 452 F.3d 726, 732 (8th Cir. 2006).

The same is true here. A lay juror—without Lanterman's proposed testimony—is fully equipped to compare, at a surface level, the two LMS platforms, analyze the information available there, and draw conclusions regarding the purported visual and functional similarities. Lanterman's opinions add nothing helpful to the jury's analysis, and they should be excluded on this basis.

Lanterman's review of emails and other discovery evidence is similarly unhelpful to the jury. According to Lanterman, computer forensic experts are sometimes necessary to serve as "translators" of digital evidence, including email correspondence, to explain "complex evidentiary findings" and to reveal information not ascertainable from the face of the documents, such as metadata. Ex. 2, at 62:5–20, 67:14–68:7. However, there is no need for a "translator" here because the significance (or not) of the emails and documents at issue arises from what those documents say on their face, not from their metadata or anything else beyond the ken of the jury. *See* Rpt. ¶¶ 27–28. Lay jurors are just as capable as Lanterman of reading and drawing conclusions from these emails and documents. Lanterman's summation of the content of various documents is "not helpful to the trier of fact" because it is "based only on . . . observations of data that require no special expertise or guidance." *Hoekman*, 335 F.R.D. at 239.

Because Lanterman applies no "scientific, technical, or other specialized knowledge [that] will help the trier of fact," his testimony is inadmissible. Fed. R. Evid. 702.

### C. Lanterman's Testimony is Misleading Because it Relies on Seemingly Technical Language for Non-Technical Conclusions

Lanterman's testimony should also be excluded because it is misleading; Lanterman relies on seemingly technical language for non-technical conclusions regarding surface-level characteristics of the websites at issue. *See Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 884 (8th Cir. 1998) (recognizing that misleading expert testimony must be excluded).

For example, Lanterman proposes to testify that Mayo and CWS "looked to the programmed functionality of K2P's platform to develop its own product." Rpt. ¶ 2. Yet Lanterman has admitted that, to arrive at his conclusion, he did not analyze "any source material . . . such as the code, coded algorithms, or other 'back-end' information that is not necessarily observable by simply accessing the portals as a user." *Id.* ¶ 16. Instead, "programmed functionality" means "what a user would see" when they "click on this button versus [that] button." Ex. 2, at 85:17–86:1. In other words, Lanterman's opinions regarding "programmed functionality" are nothing more than his surface-level observations dressed up in technical-sounding language. The jury should not be misled by Lanterman's reliance on seemingly esoteric language that has no actual technical meaning in the field. *See* Robinson Rpt. ¶ 40 ("The phrase 'looked to the programmed functionality' does not have any technical meaning within the field of computer forensics, nor does it mean Mayo or CWS looked at the K2P Platform's source code, programming languages, or underlying architecture."); *see also* Ex. 4, at 144:1–23.

As another example, Lanterman claims the K2P Platform was a "directing force" for the updates to MedEd Manager. Rpt. ¶ 30. But Lanterman conceded at

deposition that the phrase "directing force" relates only to his visual comparison of the two websites, and that he has "seen no evidence of the exfiltration of source code." Ex. 2, at 153:7–154:13; *see also* Robinson Rpt. ¶ 40.

To summarize, the phrases "programmed functionality" and "directing force" do not have technical meanings within the field of computer forensics. Just like Lanterman's opinions more generally, Lanterman's reliance on these phrases reveals the fundamental defect with his proposed testimony. None of Lanterman's opinions help the jury process information beyond their understanding. Instead, Lanterman's proposed testimony seeks to impermissibly lend an "aura of expertise" to a subject matter within the jury's knowledge and experience, i.e., the surface-level appearance and functionality of two websites. *Hoekman*, 335 F.R.D. at 239 (quoting *United States v. Arenal*, 768 F.2d 263, 269–70 (8th Cir. 1985)). To "guard against invading the province of the jury on a question which the jury [is] entirely capable of answering without the benefit of expert opinion," the Court should exclude Lanterman's proposed testimony. *Rottlund Co.*, 452 F.3d at 732 (quotation omitted).

## CONCLUSION

For the reasons set forth above, Mark Lanterman's opinions are inadmissible under Rule 702 and should be excluded.

Dated: April 13, 2023                               DORSEY & WHITNEY LLP

By *s/ Nathan J. Ebnet*
   Andrew Brantingham (#0389952)
   brantingham.andrew@dorsey.com
   Nathan Ebnet (#0395217)
   ebnet.nathan@dorsey.com
   Alan Iverson (#0399747)
   iverson.alan@dorsey.com
   Payton George (#0400073)
   george.payton@dorsey.com
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

*Attorneys for Plaintiff Mayo Foundation for Medical Education and Research*