# Ebnet Declaration Exhibit 2
## Filed under Seal

Page 1

1  UNITED STATES DISTRICT COURT
2  DISTRICT OF MINNESOTA
3  _____
4  Mayo Foundation for Medical Education and Research,
5  
   Plaintiff/Counterclaim
6  Defendant,
7  v                    Case No.: 21-cv-1039(SRN/TNL)
8  Knowledge to Practice, Inc.,
9  Defendant/Counterclaim Plaintiff,
10 _____
11             VIDEO DEPOSITION OF
12                MARK LANTERMAN
13 _____
14
15
16
17
18
19
20
21
22
23
24
25 DATE TAKEN: March 9, 2023          BY LISA M. HUTTON

Page 50

1   well, let me back up.  As an example, let's say if
2   we have a criminal case and we conduct our analysis
3   and we show X as evidence.  Our process should be
4   repeatable by a defense expert.  So if that expert
5   is trained and educated in forensics, we should
6   come to very similar conclusions.  So -- and
7   usually that's what we see.  You know, we may not
8   agree on everything, but we are kind of in the same
9   ballpark.
10 Q   Is that why sometimes, Mr. Lanterman, you're
11   appointed by the court to assist with cases,
12   because it's a factual matter?  You are telling
13   your -- you are reporting to the court here's what
14   the facts are, and then the lawyers or anybody else
15   involved, they can decide how to apply them in that
16   case?  Is that a fair description of your role
17   sometimes?
18 A   Yeah, I think that that's very fair.  And we are
19   seeing a trend in the appointment of special
20   masters, because if you think about it, I don't --
21   you know, it doesn't matter who's paying me, the
22   data is what it is.  And, you know, as an example,
23   the case I mentioned earlier involving the
24   Intoxilyzer, you know, on one side you have about
25   70 criminal defense attorneys pooling moneys to pay

Page 51

1   for me to do this.  But my report did not help my
2   client at all.  And they were not happy with me.
3   But it is what it is, and it was the truth.  And
4   even though the source code of the Intoxilyzer was
5   horribly written, the thing still worked.  And it
6   did what it was, you know, marketed to do, so...
7 Q   I'm going to ask you a few more questions about
8   your website.  So, you know, forgive me, I'm not
9   asking you to recall or have memorized every web
10   page, but they are helpful for me as I try to
11   educate myself on this stuff.  So on the CFS
12   website, there are five subtypes of digital
13   forensics that are identified there.  There's disk
14   forensics, network forensics, Internet forensics,
15   email forensics, and cloud forensics.  Does that
16   sound about right to you?
17 A   Yeah, I haven't looked at our website in a long
18   time.
19 Q   Okay.  Do you know when it was last updated?
20 A   Well, I know that we have a designer working with
21   us right now to update it, so I want to say it's
22   probably been about two years or so since it's been
23   updated.  If you have any suggestions, I would
24   appreciate it.
25 Q   No, I thought it was very slick, including your

Page 52

1   media presentations, which were great.
2 A   Thank you.
3 Q   So this designer that you are working with, what
4   sorts of things are you doing to update the
5   website?
6 A   I have no idea.
7 Q   Okay.
8 A   I'm not involved in that.
9 Q   Who's involved at CFS?
10 A   That would be Chris Lester and Nate Ditmar.
11 Q   Okay.  Okay.  So for each of those five categories,
12   I would just like you to ask -- or I would like to
13   ask you a few questions about what they mean.
14 A   Sure.
15 Q   So what type of evidence do you analyze for disk
16   forensics?
17 A   Yeah.  So by disk forensics, that would be -- let's
18   say if you are working on a case, and let's say you
19   had -- your client had an employee quit, go to work
20   for a competitor, and all of a sudden, you know,
21   clients are going to this new company.  Well, we
22   have her old work computer.  Bring it by.  Let me
23   see what's there.  So I have a physical disk.  Oh,
24   it looks like on March 5 at 5:45 p.m. after hours
25   she plugs in a USB device, here's the serial

Page 53

1   number, and she copies these 1,400 files to that
2   thumb drive, and then she deletes all of those
3   files.  Oh my God, give me a report.  So, you know,
4   that would be a typical case that I would consider
5   disk forensics.  Like you had the physical drive.
6 Q   Got it.  That makes sense.  For disk forensics, do
7   you apply a program to begin the analysis, or are
8   there certain places -- let's use the computer
9   example where you can see a history of downloads or
10   external devices inserted.  How does that process
11   work?
12 A   Yeah.  And again, it depends.  So the first step
13   would be preservation, the imaging that I
14   mentioned.  Because electronic evidence is very
15   fragile, and just turning on a computer, you modify
16   over 400 date and time stamps.  And in a lot of my
17   cases -- not all of them, but in a lot of my cases,
18   time lines are important.  What happened when.  So
19   that's why that snapshot, that imaging is so
20   important.  Because if I just take that laptop and
21   start clicking around, you know, now I'm modifying,
22   you know, the best evidence.  So generally in disk
23   forensic cases, first step is preservation imaging,
24   I read the complaint, if there is one, or I read
25   the search warrant application, or I have a phone

14 (Pages 50 - 53)

Page 54

```
 1   call, like, you know, if I talk to you on the
 2   phone.
 3          "What's going on.  I have this laptop."
 4   "What are we trying to accomplish.  Well, the
 5   client thinks X, Y, and Z.  Okay.  How about if we
 6   do this.  I want to look for evidence of USB
 7   activity, evidence of deletions.  Because a lot of
 8   times what we see is when data is stolen.  They
 9   then delete it because they think it'll hide their
10   tracks.  You know, let me see if they uploaded data
11   to Dropbox, because they think if it's in a
12   browser, they are not going to get caught.  And
13   then you say, "Yeah, that sounds good.  Go ahead
14   and do that."  And then I'll just execute the plan.
15   So I -- we preserve first.  Then I formulate a plan
16   with the client, usually an attorney.  Here's what
17   I want to do, are you okay with this.  Once I get
18   that blessing, then we move forward with the
19   analysis.
20 Q  Got it.  So I guess what I'm trying to understand
21   is that you've got the image copy of the computer,
22   you want to look for deletions or movement or a
23   time line of what has happened here with -- let's
24   just use the example of a former employee.  Do you
25   then, Mr. Lanterman, run a software program that
```

Page 55

```
 1   you've developed or your company has developed that
 2   flags some of the suspicious markers on this
 3   computer, or is it more of a manual process where
 4   you've got the mouse and you are just looking at
 5   some usual suspect locations on a computer?  Does
 6   that make sense?
 7 A  Great question.  Both.
 8 Q  Okay.
 9 A  So you know, we may have tools that will compile
10   artifacts showing which websites were being visited
11   and when, or, you know, there may be a registry
12   that I want to look at.  And I don't need to run
13   software because I know what it is I want to look
14   at.  I go to that entry.  Now I have the serial
15   number of a USB device being plugged in, and I have
16   the date and time.  So if we -- if we need to run
17   software, we do that.  Like, for example, let's say
18   if I've collected a bunch of email data -- and this
19   is not disk forensics -- but let's say you have had
20   me collect email data.  And you have to produce
21   this to opposing counsel but you want to make sure
22   that you are not inadvertently turning over
23   privileged communications.  So you may ask me,
24   "Mark, I need you to see if there are any emails to
25   or from anyone at dorsey.com.  Then I would run an
```

Page 56

```
 1   application looking to identify.  If I don't find
 2   that, I call you and I say, "Hey, I don't see
 3   anything pertaining to Dorsey," then maybe you'll
 4   produce that data.
 5 Q  Okay.  Mr. Lanterman, is it fair to say that you
 6   did not apply disk forensics to arrive at your
 7   opinions in this case?
 8 A  Correct.
 9 Q  Let me ask you now about network forensics.  What
10   type of evidence do you analyze for network
11   forensics?
12 A  So again, it depends.  Network forensics could
13   be -- there's a denial of service attack.  There's
14   something going on related to your -- to your
15   network.  You know, we -- "we think that we have
16   someone who's looking at inappropriate material
17   during lunch.  Can you take a look at the network
18   traffic and see if that's true or not?"  So it just
19   depends.
20 Q  Okay.  You look at servers for network forensics,
21   or is that something different?
22 A  No, no.  Sometimes.  You know, I may want to look
23   at the drives on a server, or if that server
24   collects logs, those logs may be helpful.
25 Q  Okay.
```

Page 57

```
 1 A  So I may ask for logs and not need to collect
 2   everything off of a server.
 3 Q  What is the difference between network forensics
 4   and Internet forensics?
 5 A  Yeah.  So I would say that the difference is that
 6   with network forensics, that has to do with your
 7   environment.  Internet forensics, we -- and you
 8   know, maybe that's a -- that's a misnomer, but with
 9   Internet forensics, that can be we have a client
10   and someone is posting derogatory information about
11   the client online.  They are -- they are submitting
12   one-star reviews on Google, and it's causing our
13   client a big problem.  What -- what can we do to
14   help.
15 Q  Okay.
16 A  You know, so I would -- you know, I would say that
17   network forensics, that's kind of in here.
18   Internet forensics is kind of a broader
19   environment.
20          THE VIDEOGRAPHER:  We are going off the
21   record.  The time now is 10:43 a.m.
22          (A short recess was taken.)
23          THE VIDEOGRAPHER:  We are going back on
24   the record.  The time now is 10:44 a.m.
25 BY MR. EBNET:
```

Page 58

1  Q  Mr. Lanterman, before we broke, we were discussing
2     network forensics and Internet forensics.  And as I
3     understand it, you described network forensics as
4     an examination of -- sort of inside the company
5     environment, and Internet forensics is a little bit
6     broader.  You are looking at what's out there and
7     what an employee may have done outside of the
8     internal network?
9  A  Yes.  Generally speaking, I mean, Internet
10    forensics could also be, you know, monitoring
11    social media or threats.  Like, for example, let's
12    say if your client is a -- you know, is an
13    agricultural product provider.  And let's say if
14    there are protests because, you know, we don't like
15    what you do to our corn or whatever, we monitor
16    social media looking for -- you know, trying to
17    predict things like protests or, you know, what is
18    the sentiment.  Does the -- does the public like
19    your company or not like your company.  Do they --
20    did they like the CEO or not like the CEO.  Did
21    someone post the address of the CEO's kids' school.
22    Well, that could be a problem.
23  Q  Did you apply network forensics to arrive at your
24    opinions in this case?
25  A  Well, I think so.  And what I mean by that is

Page 59

1     that -- it's how I access the portal.  You know, I
2     didn't go on social media or anything like that,
3     but you know, I did access the portals over the
4     Internet.  So...
5  Q  Did you -- I understand that sniffers and tracing
6     is a part of network forensics, is that fair?
7  A  It can be.
8  Q  What are those tools?
9  A  So, like, sniffing is the -- I don't know if
10    interception is the right word, but it's the
11    collection of data going over a network wire.
12  Q  Okay.
13  A  So it is -- you have to be careful doing that
14    because it's a violation of 18 UCS 1030, so you
15    know, it's technically a wiretap when you collect
16    data over the wire like that.  But it can be done.
17    That is one thing that hackers do.  For example,
18    if you are on an airplane and if you are using, you
19    know, Gogo Inflight, well, if I'm sitting in the
20    back of the plane, I might run a sniffer and now I
21    have your username and passwords for your New York
22    Times subscription.  You know.  So that's what
23    sniffing is.
24  Q  Okay.
25  A  And no, I didn't need to do that here.

Page 60

1  Q  How about tracing, what is that?
2  A  Well, I don't know what -- what you mean by that.
3     Tracing -- how I use it is let's say if someone has
4     sent one of your partners a threatening email and
5     they send -- either anonymously or the sender
6     denies they sent that.  You know, we can look at
7     that original message and make a determination if
8     it's authentic or not.  You know, just as an
9     example, you know, we were commissioned by CBS to
10    analyze the authenticity of Hunter Biden's laptop.
11    We were able to confirm that, yep, these emails are
12    authentic, and it's not a plant.  You know, there
13    are algorithms that are used by email servers, and
14    most of us don't know that.  And, you know, someone
15    can not tell the truth, and we can prove that they
16    are not telling the truth.
17  Q  Got it.  So the application of network forensics to
18    this case that you are describing is logging into
19    the K2P platform, right?
20  A  Yes.
21  Q  And the way you did that is counsel sent you a
22    username and password, right?
23  A  Yes.
24  Q  And you went to the home page that the log-in link
25    would send you, and you used those credentials, is

Page 61

1     that right?
2  A  Yes.
3  Q  What is cloud forensics?  What sort of evidence do
4     you analyze there?
5  A  So cloud forensics, again, can be a few -- you
6     know, it's different things to different people.
7     But often what it is in my case is
8     misappropriations.  It's the theft of data where,
9     you know, an example would be if you are leaving
10    your employment and you decide that client list --
11    you know, that's my list, even though it's the
12    company's list, these are my contacts.  I'm taking
13    it.  But I don't want to get jammed up.  So I'm
14    just going to upload it to my personal Dropbox
15    account and no one is going to know.  Well, we
16    know, and we can prove it.  So anything having to
17    do with cloud services, like Salesforce or Dropbox
18    or Box or SharePoint, I consider that to be cloud
19    forensics.
20  Q  Okay.  Did you apply techniques from cloud
21    forensics to the evidence at issue in this case?
22  A  No.
23  Q  Last one I think from the list of five is email
24    forensics.  I have a guess on what sort of evidence
25    you analyze, but why don't you tell me what sort of

Page 62

1  evidence do you analyze with email forensics?
2  A  So with email forensics, kind of like the example I
3     just gave.
4  Q  Yeah.
5  A  If there are emails that are being challenged or
6     questioned or, you know, they appear to be
7     fabricated, you know, we -- we can often determine
8     if emails had been modified after the fact. Like
9     as an example, let's say there's an email that
10    says, "Yes, I'll give you a 50 percent raise."
11    Well, in the sender's eye, I didn't say that. That
12    was a 5 percent raise. Well, could it be a typo?
13    Absolutely not. I look at the email on his or her
14    computer, I take a look at the email that was on
15    the other side, and, you know, we can -- we can
16    typically identify that fabrication.
17 Q  Okay. And as a part of email forensics, are you
18    looking at metadata that's associated with email as
19    well?
20 A  Yeah, I think that's fair to say.
21 Q  Okay. In this case you did review email
22    correspondence that had been produced in discovery,
23    right?
24 A  Yes.
25 Q  But your focus there, I take it, was a little bit

Page 63

1  different than some of the email forensics you are
2  describing now. If I'm understanding what you say
3  in your report, it's that you looked at emails to
4  kind of stitch together the time line of events
5  that happened in this case, is that fair?
6         THE WITNESS: Yes.
7         MS. MUIRHEAD: Objection, form.
8  BY MR. EBNET:
9  Q  But the email forensics that you are describing
10    here is a little bit different. Was there
11    manipulation of an email, for example, is that
12    right? That is one of the things that you do for
13    email forensics?
14 A  Yes.
15 Q  You look at the metadata, for example?
16 A  Yes.
17 Q  And you didn't do those particular things in this
18    case when you were looking at the emails?
19 A  No. When reviewing the emails, that was done to
20    get some context. So I wasn't analyzing the emails
21    I received for fabrication or anything like that.
22 Q  All right. And you described getting them in a PDF
23    document. Did you have the metadata that was
24    associated with the emails when you received those
25    documents?

Page 64

1  A  No -- well, yes and no. When a -- when an email is
2     in its native original electronic format, it has --
3     so and you are referring to it as metadata, but it
4     has associated with it something called headers.
5     And headers can be the originating IP address,
6     which servers did that email pass through to get to
7     you. That -- there is an algorithmic value
8     assigned, and that's what -- and it's just an
9     encrypted line. And we can process that to verify
10    authenticity because that should match -- that
11    encrypted data should match the unencrypted data.
12 Q  Yeah.
13 A  So if there's a difference -- and most people can't
14    read that encrypted data.
15 Q  Yep. And so what I'm trying to understand -- and I
16    think you've answered the question, but let me just
17    make sure I'm clear. When Dorsey, for example,
18    produced emails to opposing counsel that you
19    reviewed in this case, there was also some
20    metadata, including some of the tags that you are
21    describing now that was produced. But for purposes
22    of your review, when you are trying to get context,
23    those bits of information weren't important to you
24    as you looked at the emails. Is that fair?
25        MS. MUIRHEAD: Objection, form.

Page 65

1         THE WITNESS: You know, I don't -- I'm
2  hesitant to say it wasn't important. And I don't
3  know what format Dorsey produced in, but I received
4  PDFs. And when a -- when an email is printed to a
5  PDF file, it will typically lose the header
6  information, but it will contain the data that you
7  would see if you printed it to a piece of paper.
8  BY MR. EBNET:
9  Q  And so things like the day and time it was sent.
10    You were able to see that, of course, right?
11 A  Yes.
12 Q  And you were able to see the substance of what the
13    authors of those emails were saying?
14 A  Yes.
15 Q  And that's -- that sort of information is what you
16    used for the context that you were describing as
17    you then went on to do the analysis of the learning
18    platforms, is that right?
19 A  Yes.
20 Q  Okay. Your CV, Mr. Lanterman, also indicates that
21    you are a co-author of an e-discovery desk book,
22    right?
23 A  Yes.
24 Q  And?
25 A  Now I'm co-author and an author.

17 (Pages 62 - 65)

Page 66

1  Q   Okay.
2  A   So I have -- it just came out last week.
3  Q   Okay.  So what is the -- so I'm familiar with your
4      co-authored chapter, which I think is Forensic
5      Experts, When and How to Leverage the Talent?
6  A   You are good.
7  Q   Got it written down.  What is the chapter that you
8      are the solo author for?
9  A   So -- and that just came out.  I wrote a chapter on
10     digital -- leveraging digital forensics in criminal
11     cases.
12 Q   Okay.  Well, I look forward to reading that.  Is it
13     fair to say that you did not apply that expertise
14     because it would relate to criminal proceedings to
15     this case?
16 A   Yeah, correct.
17 Q   Well, I will ask you just a few questions about the
18     chapter that I have read.  Who's your co-author?
19 A   John Degnan, D-E-G-N-A-N, and he's with -- well,
20     they used to be Briggs, now they are Taft.
21 Q   Okay.  A lawyer, I take it?
22 A   A lawyer.
23 Q   Okay.
24 A   And John's role in that chapter was as editor.  You
25     know, so I wrote the chapter, and then John added a

Page 67

1      sentence here and there.
2  Q   Okay.  Okay.  In your chapter you write that "A
3      forensic expert conducts the analysis on the data
4      and then presents the data and devices to the legal
5      team.  This always involves complex technical
6      findings."  Does that sound about like something
7      you may have written?
8  A   Sounds like something John wrote.
9  Q   Okay.
10 A   You know, not all findings are super complex.
11 Q   Okay.
12 A   And I'll make sure that that gets corrected in the
13     next.
14 Q   You also write that the job of a computer forensic
15     expert is to be a translator for digital evidence.
16     Do you recall that?
17 A   Yes, I wrote that.
18 Q   What does it mean to be a translator of digital
19     evidence?
20 A   I think the problem is that IT people, we are
21     horrible communicators.  And I bet you know that
22     firsthand.  We use technical terms that no one else
23     understands, and we kind of like it that way
24     because we think it's job security.  But the
25     problem is if I cannot explain to you complex

Page 68

1      evidentiary findings in a way that you get it, or
2      more importantly, in a way that the fact finder
3      understands it, then really -- if I can't do that,
4      I bring no value.  So I think it is important when
5      you are working with an expert, to work with an
6      expert who's not so techy that you don't understand
7      what he or she is saying.
8  Q   And that value that you and others in your field
9      bring, is part of that because if I was looking at
10     digital evidence, I very likely wouldn't understand
11     what I'm looking at, and your job is to take that
12     digital evidence and tell me and others in a way
13     that makes sense what it is that that evidence
14     says.  Is that fair?
15         MS. MUIRHEAD:  Objection, form.
16         THE WITNESS:  Yes and no.  I don't want
17     to say you would look at something and not
18     understand it.  What my experience is, is you may
19     look at something and misinterpret it.  As an
20     example, we have multiple cases in which
21     individuals have been charged with inattentive
22     driving by the BCA, or they did the forensics, and
23     it turns out that the BCA misinterpreted that data.
24     And we had been hired by the defense on a number of
25     cases, and I -- I have a transcript in which a BCA

Page 69

1      agent said, "Oh, yeah, Lanterman is right.  We made
2      a mistake.  And it's -- it is easy to misinterpret
3      something.  You know, you may look at a piece of
4      evidence and say, "Oh, my gosh, this is so obvious.
5      Get a -- you know, that's why we do peer review,
6      because I don't want to get in the habit of looking
7      at something thinking, "Oh, yeah, I get this."
8  BY MR. EBNET:
9  Q   Okay.
10 A   You know, I want to make sure that we are right.
11 Q   The example that you gave with the BCA is
12     interesting to me because there you've got somebody
13     with presumably technical expertise --
14 A   Presumably.
15 Q   -- misinterprets the data, as you've described it.
16     What about the case where you're telling a juror
17     who doesn't have the same experience as the BCA, do
18     you have the same misinterpretation concern, or is
19     it trying to tell an ordinary person what it is
20     that they are looking at?
21 A   Yeah.  Again, a good question.  I think the problem
22     coming in -- and I'll stick to this example.  I
23     think the problem comes in when you have an agent
24     from the BCA under the imprimatur of a state law
25     enforcement agency giving information and

Page 82

```
 1  Way."  And the Elvis Presley version and the Sid
 2  Vicious version are derivative of the Frank Sinatra
 3  version.  The -- the key maybe different, maybe a
 4  couple of words changed here and there, maybe the
 5  tempo -- I'm not a musician, but, you know, like
 6  the tempo of things may be a little different.  But
 7  the fact is without Frank's version, there would
 8  not have been a Presley version or a Sid Vicious
 9  version the way that they turned out without that
10  initial building block.  And it's -- it's my
11  opinion that K2P's version is Frank, and everything
12  that came after is a derivative from that original.
13  So I know that's kind of a -- you know, unusual
14  explanation, but I thought that it was one way to
15  kind of explain my position.
16 Q   I'll do my best to -- my best to continue that
17  example in asking my questions.
18 A   Okay.
19 Q   So implicit in your findings in this case is that
20  the K2P version of the platform and the features
21  and functionalities that you observed there are the
22  Frank Sinatra.  They are the original, right?
23 A   Yes.
24 Q   And so just like if Frank Sinatra's version of the
25  song wasn't the original, and there was somebody
```

Page 83

```
 1  before him who authored that song, if that is also
 2  true in this case, that would change your opinion?
 3      MS. MUIRHEAD:  Objection, form.
 4      THE WITNESS:  Well, there was a version
 5  before Frank Sinatra -- and most people don't know
 6  it, but David Bowie wrote the words for it.  So I
 7  thought that was kind of interesting.  What -- what
 8  I am saying is it is -- and I think Mr. Robinson
 9  testified to this as well, it is easier to build
10  off of something that is already in place than to
11  start from scratch.  And I believe that's what Mayo
12  did.  I believe that K2P offered the functionality
13  that Mayo wanted.  I have seen emails saying "This
14  is what we like.  Do something like this."  And CWS
15  did that.  Okay.  So I'm not saying that Elvis
16  broke into Frank's house and stole the sheet music,
17  but I'm saying that the spirit went along for the
18  ride.  And it was the functionality and the ability
19  to build on a song that was already written, so...
20 BY MR. EBNET:
21 Q   Okay.  I want to try to clean up one thing.  I
22  thought I heard you say -- you said it's easier to
23  build off of something that already exists.  Did I
24  hear that right?
25 A   Yes.
```

Page 84

```
 1 Q   To be clear, you have not seen evidence that CWS
 2  took the source code belonging to K2P and then
 3  added some nuance to that specific source code,
 4  that's not what you are saying in this case, right?
 5 A   I -- I am not saying that.  No.  And to be clear,
 6  I've seen no evidence to indicate the theft of
 7  source code.  What I am saying is I really like
 8  your chair, but I don't want to pay for it.  I'm
 9  just going to build my own.  So I'm going to
10  measure it, I'm going to weigh it, I'm going to get
11  a sample of the leather, and I'm going to -- I'm
12  going to build a chair that's derivative of the one
13  that you are sitting in.
14 Q   Okay.  Some of what we are talking about right now,
15  I think, is embodied in paragraph two of your
16  report, which I would like you to look at.  So in
17  the -- after the comma, I see a sentence that says,
18  "Mayo looked to the programmed functionality of
19  K2P's platform to develop its own product."  Do you
20  see that?
21 A   Yes.
22 Q   And I asked you about programmed functionality
23  earlier, and what I took you to say -- but I trust
24  that you'll correct me if I'm wrong -- is that
25  that's how a website functions and looks when
```

Page 85

```
 1  viewed by a user.  Is that right?
 2      MS. MUIRHEAD:  Objection, form.
 3  Objection to the extent it misstates prior
 4  testimony.
 5      THE WITNESS:  Yes, but also -- so by
 6  functionality, I'll say that means what it does.
 7 BY MR. EBNET:
 8 Q   And let me pause there just for a moment,
 9  Mr. Lanterman.  Is there a difference between
10  functionality and programmed functionality?
11  Because you use the word "programmed
12  functionality," so I want to make sure that's what
13  we are talking about here?
14 A   Yeah.  And I'm sorry, I should have been clear.
15  No, I'm taking that phrase all in one.
16 Q   Okay.
17 A   So all that programmed functionality means is
18  someone wrote it to do something specific.  You
19  know, what -- what action occurs, you know, what do
20  you see when you click on this button versus this
21  button?
22 Q   Okay.
23 A   It's how it functions.
24 Q   Okay.  And when you say "what you see," you are
25  talking about what a user would see?
```

22 (Pages 82 - 85)

Page 86

1  A   That's correct.
2  Q   You looked at -- when you did your analysis, that
3      I'll talk about in a little bit, you saw the same
4      things that a user would see when they logged in,
5      for example, to the K2P platform?
6  A   Yes.
7  Q   Okay.
8  A   And if I could add one thing, you know, I'm a
9      visual person, so I like little screenshots.  So if
10     you go to page 11 of my report --
11 Q   Well, Mr. Lanterman, I'm going to stop you.  I'm
12     sorry, I'm going to stop you there.  We will
13     absolutely get on to page 11 --
14 A   Oh, okay.
15 Q   -- but let me --
16 A   I'm sorry.
17 Q   -- continue here for a little bit.
18 A   Sure.
19 Q   No problem.  From a programming perspective, you
20     don't know how the features that you observed on
21     the K2P platform were built, right?
22 A   That's hard to answer.
23 Q   Let me ask a different question then.  You didn't
24     speak -- you testified earlier that you didn't
25     speak to any of the developers that had written the

Page 87

1      code that drives the K2P platform, right?
2  A   That's -- that's correct.
3  Q   You were not there when the platform was developed,
4      right?
5  A   That's correct.
6  Q   You don't know the time or expense it took either
7      K2P or CWS to build the K2P platform and the MedEd
8      Manager platform respectively, right?
9  A   That's correct.
10 Q   And there might be some, again, imprecision here,
11     so forgive me, but you also don't know the coding,
12     the coding language that was used for the K2P
13     platform, right?
14 A   That's correct.
15 Q   And you also don't know the coding language that
16     was used for the MedEd Manager platform?
17 A   That's correct.
18 Q   Do you know how much time it took CWS to build the
19     MedEd Manager platform?
20 A   I don't, but I will say that when you have a
21     working example, it can help you save time.  So,
22     you know, for example, if I put a report in front
23     of you and I say, "Okay, this is how I want reports
24     to look.  I want an introduction here and then I
25     want a heading that says, you know, materials

Page 88

1      reviewed, I want that on either the first or the
2      second page."  You know, I'm giving you a guide.
3      And if I give you a guide, when you go to write
4      your next report, that hopefully will save you some
5      time because you know what information goes where.
6  Q   That's also true, is it not, if you are the author
7      of that previous guide.  For example,
8      Mr. Lanterman, if you've reviewed many cell phones
9      in the past and you have a template, obviously the
10     facts change, but you have a template for how you
11     write a report that analyzes a cell phone and the
12     data therein.  That working example, if it's your
13     own, that also saves you time in the future, right?
14         MS. MUIRHEAD:  Objection, form.
15         THE WITNESS:  Absolutely, but that's
16     not what happened here.
17 BY MR. EBNET:
18 Q   Okay.  If you would, please, turn to page 17 of
19     your report -- or I'm sorry, paragraph 17 on page
20     4?
21 A   17?
22 Q   Yep, paragraph 17, my mistake.
23 A   That's okay.  Okay.
24 Q   Did you collect any digital evidence in order to
25     conduct your analysis in this case?

Page 89

1  A   I did.  I created screenshots.
2  Q   Okay.  Are the screenshots that you created the
3      ones that are in your report?
4  A   At least one of them is, yes.
5  Q   Which one is that?  I see three figures, Figure 1,
6      Figure 2, and Figure 3.  Which is the screenshot?
7  A   So Figure 1, Figure 2, and Figure 3.
8  Q   Those are screenshots, Mr. Lanterman --
9  A   Yes.
10 Q   -- that you took?  And you took those screenshots
11     when you logged on using user credentials that you
12     had been provided in this case, right?
13 A   Yes.
14 Q   Other than these screenshots, did you image any
15     digital evidence in this case?
16 A   Imaged as in creating forensic images?
17 Q   Exactly, the process you were describing to me
18     earlier?
19 A   Well, I asked for Ms. Babcock's computer, but I was
20     told that Mayo destroyed it.  So I did not have an
21     opportunity to image that.  I'm trying to think if
22     I asked for any other.  I know that I asked for the
23     source code, and I didn't receive that.  I don't
24     think I forensically imaged data in this case.
25 Q   Does taking a screenshot like you did in this case

Page 102

1  THE WITNESS: No.
2  MR. EBNET: Okay. Why don't we stop
3  there. Let's take about an hour break and we can
4  resume.
5  THE WITNESS: Okay.
6  THE VIDEOGRAPHER: We are going off
7  record at 11:46 a.m.
8  And this concludes Media Unit Number 2.
9  (A short recess was taken.)
10  THE VIDEOGRAPHER: We are going back on
11  the record at 12:46 p.m. This is the beginning of
12  Media Unit Number 3.
13  BY MR. EBNET:
14  Q  Mr. Lanterman, I want to clean up a few things that
15     I neglected to ask you about in the first half of
16     the day. You recall that we had a discussion about
17     some of the categories of forensics that your
18     company routinely participates, things like disk
19     forensics. Do you recall that discussion?
20  A  Yes.
21  Q  And one of the categories was internet forensics,
22     do you recall that?
23  A  Yes.
24  Q  And I neglected to ask, did you apply internet
25     forensics to the evidence at issue in this case?

Page 103

1  A  Well, I did use the internet to conduct an
2     analysis. I would say yes.
3  Q  Beyond using the internet to access the K2P
4     platforms, were there any forensic programs that
5     you used for internet forensics?
6  A  Well, I used a web browser to access the portals --
7  Q  Google?
8  A  -- to conduct my analysis.
9  Q  Like Firefox or --
10 A  Yeah, Chrome.
11 Q  Chrome is what you used? Okay. Do you have a
12    version of Chrome that is different from the
13    version of Chrome I have on my computer?
14 A  I don't know. I always use the most current
15    version. So if you too are using the most current
16    version, then yes.
17 Q  Okay. So other than needing to access the K2P
18    platform and the MedEd Manager platform online,
19    anything else from the internet forensics
20    discipline that you applied to reach your opinions
21    in this case?
22 A  No, I didn't -- I don't think anything else was
23    necessary.
24 Q  Mr. Lanterman, if you turn to paragraph 29 of your
25    report. Do you still have that document in front

Page 104

1     of you?
2  A  I do.
3  Q  Okay. And here you identify six features that Mayo
4     purportedly instructed CWS to create on a platform.
5     Do you see that?
6  A  Yes.
7  Q  There are content library, right?
8  A  Yes.
9  Q  Test assessments?
10 A  Yes.
11 Q  Personalized learning?
12 A  Yes.
13 Q  Maintenance of certification credits?
14 A  Yes.
15 Q  Note-taking capability?
16 A  Yes.
17 Q  And finally an option for video or audio
18    presentations. Do you see that?
19 A  Yes, I do.
20 Q  Okay. Have you investigated whether any of these
21    six features were available on learning management
22    systems other than K2P?
23 A  Well, I did review the deposition transcript of
24    Mr. McGinnis, and I believe, if I recall -- it's
25    been a while since I've reviewed that -- but I

Page 105

1     believe that Mr. McGinnis stated that these
2     features had not been in place.
3  Q  Okay. So setting aside the testimony of
4     Mr. McGinnis, have you conducted an independent
5     investigation into whether or not these six
6     features were available on other platforms?
7  A  I thought that Mr. McGinnis answered the questions
8     that I had. So other than reviewing his testimony,
9     which I assume was under oath and truthful, I
10    conducted no independent analysis.
11 Q  You mentioned earlier, I think in connection with
12    your teaching work, a learning management system
13    called Canvas. Did I get that right?
14 A  Yes.
15 Q  Is that the one that's used at Hamline or
16    St. Thomas or both?
17 A  I think they both use it.
18 Q  Okay. And you used that learning management system
19    to teach your course?
20 A  Yes. That's the platform that the -- that the
21    school has invested in. So, you know, all classes.
22    And, you know, all classes with remote students
23    utilize that platform, to the best of my knowledge.
24 Q  Okay. And how do you specifically interact with
25    the Canvas platform in connection with your

27 (Pages 102 - 105)

Page 106

1  teaching responsibilities?
2  A  Through a web browser. I need to go to a specific
3     URL. I authenticate using a username and password,
4     and then I'm presented with the Canvas portal, and
5     then from that portal I can manage my class. So I
6     can upload my recorded lectures. I can -- well,
7     one thing that I like to do is I like having my --
8     my students discuss weekly the latest cyber event
9     in the news -- and there's always multiple -- so
10    just monitoring how comments are made. I -- I have
11    a calendar so that students know when assignments
12    are due or when quizzes or tests are coming up.
13 Q  Are the -- are the quizzes or tests administered
14    through the portal or is that in person?
15 A  That's through the portal.
16 Q  Do you grade the assignments or tests through the
17    portal?
18 A  Well, I -- I review what's there, but then with
19    assignments, I print them out, I grade them, and
20    then I upload the grades. So I would say it's a
21    combination of both.
22 Q  I understand. Fair to say that your students, to
23    get your remarks if you have any and their grade
24    for the assignments, they log in to the portal and
25    access that information that way?

Page 107

1  A  Yes and no. Often I will -- you know, if it's
2     appropriate, I will communicate via -- via email.
3     Sometimes if -- maybe if a student isn't doing
4     well, I would prefer to reach out to them privately
5     and just ask if, you know, is everything okay. You
6     know, is there anything I can do to help you
7     succeed? So I try to do that privately.
8  Q  Okay. Are any of the quizzes as a part of your
9     classes -- are they multiple choice or essay
10    format?
11 A  Both.
12 Q  Okay. All right. Let me return now,
13    Mr. Lanterman, to your opinions in this case. And
14    I want to specifically focus now on the three
15    learning platforms that you describe in your
16    report, and then the analysis that you conducted of
17    them, okay?
18 A  Okay.
19 Q  All right. So the three learning management
20    systems that I take away from your report that you
21    reference are the K2P portal. We've talked about
22    that, right?
23 A  Yes.
24 Q  The Mayo CV course portal, right?
25 A  Yes.

Page 108

1  Q  And then the third is the Mayo internal medicine
2     course, right?
3  A  Yes.
4  Q  Okay. So the Mayo CV course portal, that is the
5     MedEd Manager platform, is that right?
6  A  That's my understanding.
7  Q  Okay. For the K2P portal, how much time did you
8     spend on that platform to conduct your analysis?
9  A  I believe -- boy, I hate to guess, I believe it was
10    about two to three hours.
11 Q  Okay. Same question for the MedEd Manager
12    platform, how long did you spend there to conduct
13    your analysis?
14 A  I believe about the same.
15 Q  And just to be clear, that's an additional two to
16    three hours?
17 A  Yes.
18 Q  All right. And then same question for the last
19    platform, this Mayo internal medicine course, did
20    you log in there?
21 A  I don't recall. If I did, it would be in my
22    report. I'm drawing a blank on whether I did or
23    not.
24 Q  Well, I'll ask you some additional questions on
25    what you did and what you didn't, so we'll probably

Page 109

1     arrive at an answer --
2  A  Okay.
3  Q  -- as we go through here. Let's -- let's return
4     then to the K2P platform.
5  A  Okay.
6  Q  And walk me through how you got there. You know,
7     what was your process to get in and then start
8     conducting your analysis?
9  A  Sure. Is that described in my report? Is there a
10    paragraph you want to direct me to?
11 Q  No, for this I would just like as you sit here
12    today, if you could tell me what your analysis was?
13 A  And this was of the K2P?
14 Q  K2P platform, yep.
15 A  So with the K2P platform, I was supplied a URL and
16    a username and password. I logged in. I walked
17    through the different pages, clicked on the
18    different buttons. I took a test. I failed the
19    first time, I think I passed the second time, but
20    the first one was not a good score. I took notes,
21    took some screenshots. I was really focusing on
22    the -- the experience, what's it like, you know, if
23    I were a student. Is this organized? Is this
24    intuitive? So...
25 Q  When you first log in, you enter the username and

Page 110

1  password and clicked the proceed or log-in button,
2  whatever it says, do you land at a home page?
3  A  Yeah, that's my recollection.
4  Q  And then from there, how did you decide where to
5     go?
6  A  Whatever was in front of me. I wanted to click on
7     many things. I wanted to experience as much of the
8     portal as I could. I don't recall which order I
9     went in. It's been a few months since I've looked
10    at this, but I -- I did not limit myself. I wanted
11    to see, you know, what was there and how students
12    would navigate.
13 Q  Is it fair to say, Mr. Lanterman, that you put
14    yourself in the position of any user who might be
15    accessing the K2P platform?
16 A  Yes.
17 Q  To your understanding, you saw what an ordinary
18    user would see when they logged on?
19 A  An ordinary user with credentials, right?
20 Q  And you get those credentials by purchasing the
21    course, is that your understanding?
22 A  That is my understanding. And this -- in this
23    case, I did not purchase credentials.
24 Q  I'm glad you didn't.
25 A  I received them.

Page 111

1  Q  Yep. Did you click on every link that was
2     available to you on the K2P platform?
3  A  Every -- every link that I could see. So my answer
4     is yes. But if there was something hidden, I -- I
5     would not have seen that.
6  Q  When you logged on to the K2P platform, did you run
7     any forensic diagnostics to compare or evaluate
8     what you were looking at?
9         MS. MUIRHEAD: Objection, form.
10        THE WITNESS: No, I didn't think that
11    that would be necessary. I didn't believe that
12    that was part of my objective. I wasn't trying to
13    dissect. I wasn't trying to do, you know, an
14    evaluation as to whether the code was well written
15    or not. Again, I wanted to -- I wanted to put
16    myself in the shoes of the user and document what
17    that user experience was.
18 BY MR. EBNET:
19 Q  And to be clear, when you say you weren't doing an
20    analysis of the source code, at least as it relates
21    to logging in, you could not see the source code
22    when you logged in using the user credentials that
23    you had been provided?
24 A  Yeah. I could not see the source code in its
25    entirety. I wasn't provided that. Certainly I

Page 112

1  looked at the code that was presented to the
2  browser, there are inspections that can be done.
3  I -- I looked at that. There was nothing that
4  jumped out at me as, you know, being important
5  enough to include in my report.
6  Q  Okay. If I wanted to replicate, Mr. Lanterman, the
7     pathway that you took as you looked at the K2P
8     platform, how would I do that?
9  A  You would open up a browser, you would put in the
10    proper URL, you should get the same credentials
11    that I had been provided, and then once you
12    authenticate, click on everything you see.
13 Q  You don't have a list, do you, Mr. Lanterman, of
14    the order in which you clicked on the various
15    links?
16 A  No.
17 Q  You don't have a list of all of the links you
18    clicked on, right?
19 A  No, just every link that I saw, everything that was
20    clickable, I clicked on.
21 Q  And I take it you saw more available on the K2P
22    platform than is presented in the three figures in
23    your report, right?
24 A  Yes.
25 Q  Same question for the MedEd Manager platform, when

Page 113

1  you were conducting your analysis, you saw more
2  information than it captured in the three figures
3  in your report, right?
4  A  Yes.
5  Q  If you look at paragraph 16 of your report,
6     Mr. Lanterman, which is on page 4 --
7  A  Okay. Okay.
8  Q  -- as I read this paragraph, you state -- and we've
9     touched on this a little bit previously, but that
10    you were not provided anything that was not
11    observable simply by accessing the portal as a
12    user. Do you see that?
13 A  Yes.
14 Q  And you agree as you sit here today?
15 A  Yes.
16 Q  All right. I want to drill down a little bit more,
17    Mr. Lanterman, on the specific course that you
18    looked at. So if you turn to page 9 of your report
19    and actually look at the footnote there, do you see
20    that footnote?
21 A  Yes.
22 Q  Let me know when you are ready.
23 A  Okay.
24 Q  Here as I read this, you describe a comparison you
25    conducted of this 2020 Interventional Cardiology

29 (Pages 110 - 113)

Page 114

1  Online Board Review course. That's the one hosted
2  on MedEd Manager. And you compared that to the
3  Mayo Clinic Interventional Cardiology Online Board
4  Review, which is the one hosted on K2P's platform.
5  Do I have that right?
6  A   Yes.
7  Q   Do you understand that Interventional Cardiology
8  Online Board Review course to be one of the
9  subspecialty courses at issue in this case?
10 A   Yes, that is my understanding.
11 Q   Okay. How did you decide to analyze this specific
12     course?
13 A   Well, I don't recall exactly what my thought
14     process was. I believe I thought that it would be
15     a good example.
16 Q   Did you conduct this -- well, first, let me ask,
17     were there other board review courses available on
18     the K2P platform in the MedEd Manager platform?
19 A   I don't recall. It's been a few months since I
20     looked at that.
21 Q   Okay. Do you have any reason to disagree, with my
22     representation that there are many courses
23     available on the two platforms?
24 A   Well, I have no reason to disagree with the caveat
25     that I've not looked at it in a few months.

Page 115

1  Q   Okay. The analysis that you describe in your
2      report that relates to this Interventional
3      Cardiology course, did you replicate that analysis
4      for any of the other potential courses that may be
5      on the two platforms?
6  A   If I did, it would be in my report.
7  Q   And I don't see it there. Do you recall there
8      being a separate section in your report talking
9      about other courses?
10 A   No. I think I chose to focus on this as an
11     example.
12 Q   Okay. And I know it's been a few months, but how
13     did you make the determination that that would be a
14     representative example for the other courses or
15     information that is available in the platforms?
16 A   Well, I didn't think that it would be helpful for
17     me to do this type of comparison for every course,
18     so I -- I chose this one. There was no, you know
19     there was no specific reason, it was just -- just
20     the one I chose.
21 Q   So you don't know, for example, Mr. Lanterman,
22     whether Figure 1 in your report that's on
23     page 11 -- whether the information that's provided
24     there is the same or different between the
25     available courses -- other available courses on the

Page 116

1      K2P platform?
2  A   Yeah, my -- and again, I hate to guess, but my --
3      my vague recollection is they were all pretty
4      similar to this. But again, it's been a while
5      since I've looked. But my recollection is that
6      this is representative of what the other ones
7      looked like as well.
8  Q   And I'm not trying to belabor the point, I'm just
9      trying to understand. I thought you had just said
10     that you -- first, you didn't know whether there
11     were other courses available or not, and then
12     second, that you didn't click into all of those
13     courses. I'm hearing something a little bit
14     different now, so help me understand.
15 A   Yeah, so I don't specifically recall because it's
16     been a while. But as I sit here and I'm looking at
17     Figure 1, I do remember seeing that for other
18     courses. But again, it's -- it's been a while.
19 Q   Okay. So the third platform that we talked about
20     at the outset was this Mayo internal medicine
21     platform, do you recall that?
22 A   Yes.
23 Q   And it's my understanding that the Mayo internal
24     medicine course was hosted on an entirely different
25     platform today called Ethos. Are you aware of

Page 117

1      that?
2  A   I believe that I am aware of that.
3  Q   And the analysis that I see on paragraphs 31
4      through 34 in your report --
5  A   I'm sorry, 31 through 34?
6  Q   Yeah, it's essentially the end of your analysis --
7  A   Okay.
8  Q   -- in this section, yes.
9  A   Okay.
10 Q   When I read those paragraphs, it appears to me that
11     they all relate to this comparison that you
12     conducted between the MedEd Manager platform and
13     the K2P platform?
14 A   Uh-huh, correct.
15 Q   You are not expressing an opinion here about
16     whether the internal medicine platform, this Ethos
17     system, is similar or different compared to the K2P
18     platform?
19 A   Yeah, I chose this as the example.
20 Q   Right. And to drill down even further, you chose
21     not only this subspecialty course which we've
22     talked about, but you've chosen specifically the
23     MedEd Manager platform, not the Ethos platform to
24     do your comparison?
25 A   I believe that's correct, yes.

30 (Pages 114 - 117)

Page 134

1   there an underlying content that they have to be
2   tied to, is that fair?
3 A   I don't know if it has to be anchored.  It could
4   be.  I guess it could be anchored, but I don't know
5   if it has to be anchored.
6 Q   All right.  Let's -- let's turn to G, subpart G,
7   which is course evaluations.  That's on page 11.
8 A   Okay.
9 Q   Does the Canvas platform allow your students,
10   Mr. Lanterman, to review you as an instructor?
11 A   I know that there are evaluations.  I don't believe
12   that that is done through Canvas.  I believe that
13   that is a separate communication from my
14   supervisors, like the people that write my checks
15   to the students, "Hey, we want to make sure that
16   you had a good experience.  What did you like?
17   What didn't you like?  How would you rate this?
18   What could we do better?  What did you think about
19   the materials?  You know, did it fulfill your
20   expectations?" and then it's -- that it's submitted
21   back.
22       So normally I initially get bypassed in
23   that.  It goes to my associate dean, and then it
24   filters back to me, like, usually pretty quickly.
25 Q   Okay.  Is it your opinion, Mr. Lanterman, that K2P

Page 135

1   invented the concept of submitting performance
2   reviews or any sort of reviews about instructors
3   and faculty?
4 A   No.
5 Q   All right.  Let's turn to paragraph 34 now in the
6   subsequent three diagrams that you set forth in
7   your report.  How did you -- we've talked about --
8   a little bit about how -- the process in which you
9   captured these, which are all screenshots, I take
10   it, right?
11 A   Yes.
12 Q   How did you decide on these specific -- three
13   specific figures as opposed to all of the other
14   information that was available for this
15   Interventional Cardiology course?
16 A   Well, I thought that these were good
17   demonstratives.  So there's -- you know, really
18   nothing other than these were the examples that I
19   chose to include.
20 Q   And based on the testimony that you've provided
21   today, I understand there is significant additional
22   material available to a user and available to you
23   that is not represented in these figures, right?
24       MS. MUIRHEAD:  Objection, form.
25       THE WITNESS:  Yeah, I don't know that I

Page 136

1   said that.
2 BY MR. EBNET:
3 Q   Okay.  Well, let me just ask you that question
4   then.
5 A   Okay.
6 Q   Is there significant additional material available,
7   for example, on the K2P platform beyond the two
8   figures that you set forth here that relate to that
9   platform?
10       MS. MUIRHEAD:  Objection, form.
11       THE WITNESS:  Well, the underlying
12   material, when once you start clicking through the
13   links, would be additional materials.  I did not
14   create screenshots for everything that came up on
15   my screen.
16 BY MR. EBNET:
17 Q   Okay.  And that's exactly what I'm asking.
18 A   Sure.
19 Q   So you didn't take a screenshot of the actual
20   lecture that's available online, right?
21 A   That's correct.
22 Q   Or all of the test questions that are available
23   online?
24 A   That's correct.
25 Q   Or the content recommendations that you received

Page 137

1   after taking the examinations, right?
2 A   That's correct.
3 Q   And I take it from your testimony -- and this is
4   something I do think you said earlier -- that you
5   do not have a repository somewhere else outside of
6   this report documenting the various other
7   screenshots of other parts of the K2P platform?
8 A   Correct.  This is the totality of my opinion.
9 Q   Yep.  In Figure 1, what are you comparing here?
10 A   Well, I'm comparing the organization and features
11   of K2P's portal to the Mayo's portal.
12 Q   Okay.  What would you call the -- the information
13   that's presented on the K2P portal and the MedEd
14   Manager portal that you are setting forth here.  Is
15   this a table of contents?  A syllabus?  What would
16   you call this?
17 A   Well, I would call this -- you know, I guess, you
18   know, any of the descriptions you just said would
19   be fine.  I would refer to them as functions or
20   links.  These are gateways to another place that a
21   learner may want to go to.
22 Q   Once you selected, Mr. Lanterman, the
23   Interventional Cardiology course.  Was this the --
24   a portion of the first screen that you arrived at?
25   Do you understand what I'm asking?

35 (Pages 134 - 137)

Page 138

```
 1           MS. MUIRHEAD:  Objection, form.
 2           THE WITNESS:  Yes.
 3   BY MR. EBNET:
 4   Q   Okay.  Yes, you understand, or yes --
 5   A   Yes, I understand, and yes, this is where I landed.
 6   Q   Okay.  Great.  And on that landing page, is this a
 7       portion of the information that you could see there
 8       or was this the entire page?
 9   A   Yeah, I don't recall.  Yeah, I just don't recall.
10   Q   That's fair.  And so you don't know as you sit here
11       today one way or the other if, for example, on the
12       K2P table of contents there is additional
13       information displayed to the right or the left of
14       what you've got in Figure 1 here?
15   A   Yeah, I don't recall.  I think that the screenshot
16       is the -- the total page, but again, I don't want
17       to -- want to guess.  So I don't know.
18   Q   And the -- if it's a portion or the entire page,
19       you selected this because you thought it was a good
20       demonstrative of the functionality between the two
21       platforms, right?
22   A   I did, yes.
23   Q   Okay.  And just to be clear, K2P's platform is on
24       the left, the MedEd Manager platform is on the
25       right in Figure 1?
```

Page 139

```
 1   A   Yes.
 2   Q   You added the arrows, right, Mr. Lanterman?
 3   A   Yes.
 4   Q   And what do they mean?
 5   A   Well, I am trying to illustrate for the reader
 6       the -- the comparison.  I'm trying to take the
 7       content of the left-hand side and direct the
 8       reader's attention to the course-responding
 9       functionality on the right-hand side.
10   Q   So let's just start with the top one.  Why did you
11       decide to draw an arrow between personalized
12       learning on the left and then pre-assessment and
13       post-assessments on the right?
14   A   Because those are nearly identical functions.
15   Q   How so?
16   A   Because there are pre assessments and
17       post-assessments.
18   Q   Under the personalized learning --
19   A   Yes.
20   Q   -- link?  Would you agree with me, Mr. Lanterman
21       that only the word "faculty" is identical between
22       the left and the right?
23   A   Well, identical, I would agree.  But it does say
24       "course evaluation," which points to "evaluation."
25       "Content library" points to "course content."
```

Page 140

```
 1   Q   Yep.  And I see the arrows, and my --
 2   A   Right.
 3   Q   -- question, which you've answered, is the only
 4       identical term is faculty, right?
 5   A   Yes.
 6   Q   Okay.  In other words, there are surface level
 7       differences, the visual differences that you noted
 8       earlier between the two platforms?
 9   A   Yes, as referenced in paragraph 32.
10   Q   Right.  Some of the things that I see -- you know,
11       K2P's platform has icons, and Mayo's does not.  Do
12       you see that?  Icons next to the link?
13           MS. MUIRHEAD:  Objection, form.
14           THE WITNESS:  I do, yes.
15   BY MR. EBNET:
16   Q   Mayo has an "announcements" link, do you see that,
17       Mr. Lanterman?
18   A   Yes.
19   Q   And K2P's does not?
20   A   Correct.
21   Q   And I don't see an arrow pointing between anything
22       on the K2P side to the announcement side, right?
23   A   Correct.
24   Q   Mayo's has a "getting started" and "event
25       dashboard," and I don't see any arrow linking those
```

Page 141

```
 1       to the K2P platform, is that right?
 2   A   That's correct.
 3   Q   Let's turn to the next page, Mr. Lanterman.  And
 4       move on to Figure 2.  Actually, I apologize, one
 5       more question about Figure 1?
 6   A   Sure.
 7   Q   You told me that you have an arrow between
 8       "personalized learning" and "pre-assessment and
 9       post-assessment" because, if I'm understanding you
10       correctly, when you click on "personalized
11       learning" for K2P, you go to pre-assessment and
12       post-assessment tests, right?
13   A   Yes.
14   Q   But you did not do an analysis of how the questions
15       or answers might be similar or different between
16       the examinations that are available there?
17           MS. MUIRHEAD:  Objection, form.
18           THE WITNESS:  Correct.  I did not put
19       questions side by side.
20   BY MR. EBNET:
21   Q   Okay.
22   A   And are we on page 12 now?
23   Q   Yes, we are.
24   A   Sure.
25   Q   What does Figure 2 show, Mr. Lanterman?
```

36 (Pages 138 - 141)

Page 146

```
 1  assessments results because it has a comparison
 2  between the pretest and post-test as I see it?
 3  A   Yep, correct.
 4  Q   I don't see a class average functionality, do you?
 5  A   No.
 6  Q   Similar to Figure 2 and Figure 1, was there other
 7  information displayed on the screen that is not
 8  captured in this screenshot in Figure 3?
 9          MS. MUIRHEAD:  Objection, form.
10          THE WITNESS:  And I'm sorry, could you
11  ask that again?
12  BY MR. EBNET:
13  Q   Happy too.  Figure 3 shows a screenshot that you
14  took of the MedEd Manager platform, right?
15  A   Yes.
16  Q   Was there additional information displayed on the
17  page beyond what is represented in Figure 3?
18  A   I believe that there was, but not relating to the
19  results.  So I believe that there were some icons
20  that would have allowed me to get out of this
21  screen and take me someplace else, but there was
22  nothing -- there was no other information displayed
23  relating to the results.
24  Q   Okay.  Are you able to see from this results page
25  the number of questions that you were asked and
```

Page 147

```
 1  answered?
 2  A   No, not from this.
 3  Q   The results here are expressed as percentages,
 4  right?
 5  A   That's correct.
 6  Q   Are these results that you got, Mr. Lanterman?
 7  A   Yes.
 8  Q   The first row under the basics, Mr. Lanterman, I
 9  see a heading that says, "Medical statistics,
10  pearls for the boards."  Do you see that?
11  A   Yes.
12  Q   Is "pearls" another word that you've come across in
13  your teaching experience?
14  A   I don't think so, no.
15  Q   The other aspect of your opinion, Mr. Lanterman,
16  beyond the analysis of the platforms that we've
17  just been talking about, is the email review that
18  we discussed earlier.  Do you recall that?
19  A   Yes.
20  Q   You described this review as providing the
21  necessary context for you to provide your opinions
22  in this case, right?
23  A   Yes.
24  Q   One of your conclusions, as I understand it from
25  your review of the project correspondence, is that
```

Page 148

```
 1  Mayo's access credentials to view the K2P platform
 2  were shared with CWS.  Do I have that right?
 3  A   Yes.
 4  Q   And I think that a note to look at, paragraph
 5  28D --
 6  A   28D?
 7  Q   Yep, on page 7.
 8  A   Okay.
 9  Q   Do you know, Mr. Lanterman, the level of access
10  that the credentials that you received for the K2P
11  platform provided you?
12  A   I'm not sure how to answer that.  Could you
13  rephrase it?
14  Q   Let me ask it in a different way, yeah.  You had
15  ordinary user credentialing to access the K2P
16  platform?
17          MS. MUIRHEAD:  Objection, foundation.
18  Objection, form.
19          THE WITNESS:  That's my understanding,
20  yes.
21  BY MR. EBNET:
22  Q   Okay.  You saw what a learner would see when they
23  logged in, to the best of your understanding?
24  A   Yes.
25  Q   Okay.  Have you seen any evidence describing the
```

Page 149

```
 1  level of access that CWS had if they logged in
 2  using the Mayo credentials?
 3  A   I believe I read something about -- or describing
 4  the credentials supplied to CWS as administrator
 5  credentials.
 6  Q   Do you know what that means?
 7  A   Well, I think I know what that means.  I don't know
 8  how, you know, people from other organizations
 9  think, you know, what they mean by that.  You know,
10  we -- you know, unfortunately IT people use terms,
11  and we assume we all say it -- the same words for
12  the same things.  My understanding of admin is you
13  can do pretty much whatever you want.  So if I
14  wanted to see if you were logged in, if I wanted to
15  see your test results, if I wanted to see the last
16  time you logged in, you know -- but I -- I did not
17  have that level of access.
18  Q   Okay.  What evidence are you thinking of that
19  described this administrative access?
20  A   I believe that I read either -- well, I thought
21  that it was in McGinnis's deposition transcript,
22  but again, it's been a while since I've -- since
23  I've seen that.  I know -- I believe I read
24  something describing the credentials as being
25  administrative.
```

Page 150

```
 1  Q   Okay.  And the specifics of what administrative
 2      credentials mean in this case, you have a general
 3      understanding of what they might mean, but you
 4      haven't seen anything in the documents describing
 5      exactly what that allowed CWS or Mayo or anybody
 6      else to see or not see?
 7  A   Yeah, correct.  Administrative typically means just
 8      that.  You can -- you know, I don't want to sound
 9      blasphemous, but it's often referred to as God
10      mode.
11  Q   Do you have administrative access for your
12      company's website?
13  A   Yes, I can do edits to the website.
14  Q   You can add news coverage that you've recently done
15      and put it on the website, right?
16  A   Yes.
17  Q   When I go to your website, I can't upload any video
18      I want to the front page of your website, right?
19  A   That's correct.
20  Q   Have you seen any evidence in this case,
21      Mr. Lanterman, that suggests that CWS could see the
22      source code of the K2P platform if they logged in
23      with the credentials that Mayo provided them?
24  A   I've not seen anything that would suggest that to
25      me.  It's not surprising, they are kind of two
```

Page 151

```
 1      separate things.  But with any kind of credential,
 2      whether user or administrator, you would need that
 3      kind of access to evaluate the functionality.  But
 4      I don't -- I have no reason to believe that CWS
 5      accessed source code.
 6  Q   Are you aware one way or the other, Mr. Lanterman,
 7      if there were free trials offered for the K2P
 8      platform where anybody could sign up?
 9  A   I don't know.
10  Q   You have not performed a forensic analysis,
11      Mr. Lanterman, of the type of access that CWS may
12      have been given to the K2P platform?
13          MS. MUIRHEAD:  Objection, form.
14  BY MR. EBNET:
15  Q   Is that right?
16  A   Well, I've reviewed documents discussing CWS's
17      access to the platform.  If you want to call that
18      an analysis, you know.  I mean, I read the
19      documents talking about it.
20  Q   You read the documents that have been produced in
21      this case, right?
22  A   Yes.
23  Q   And what I'm trying to understand is whether you
24      had any visibility into the actual username and
25      password that CWS may have been given and what was
```

Page 152

```
 1      actually presented to them when they used that
 2      password, if they did?
 3          MS. MUIRHEAD:  Objection, form.
 4          THE WITNESS:  I've not spoke with
 5      anyone from CWS.  I believe I read that they were
 6      given administrative credentials to access K2P's
 7      platform, but I've not spoken with anyone from CWS.
 8      I wasn't in the room when this evaluation took
 9      place.
10  BY MR. EBNET:
11  Q   And again, what you've just described as you
12      don't -- you don't know one way or the other what
13      administrative access, if that was provided here --
14      what that allowed CWS to see or not see?
15          MS. MUIRHEAD:  Objection, form.
16      Objection, asked and answered.
17          THE WITNESS:  Yes and no.  What I'll
18      add to that is if they had any kind of user
19      credential that authenticated, like a proper
20      password, they would have seen at least what I saw.
21  BY MR. EBNET:
22  Q   And I'm sorry to interrupt, what you saw is what a
23      user would see, right?
24  A   That's correct.
25  Q   And I want to touch on paragraph 306 your report,
```

Page 153

```
 1      Mr. Lanterman, which is on page 9?
 2  A   Okay.
 3  Q   Here you say, among other things, that the K2P
 4      platform was a directing force in the development
 5      of MedEd Manager, do you see that?
 6  A   Yes.
 7  Q   What do you mean by "directing force"?
 8  A   Well, what I mean by that is I've read multiple
 9      communications, and I had seen statements in
10      transcripts under oath in which CWS was directed to
11      look at K2P.  You know, essentially that's what we
12      want, go look at it and make it happen.  So by the
13      driving force, what I'm saying is that's -- that's
14      Frank's song, and I want to do something just like
15      he did.  That analogy, I apologize, but...
16  Q   Does "directing force" mean the same thing to you
17      as inspiration?  They wanted CWS to use the K2P
18      platform as inspiration?
19  A   I think it's a little bit more than inspiration.
20      You know, there's a -- there's a difference.  If I
21      look at your law firm's website, it's really nice.
22      It's professional.  I like the color scheme.  And I
23      go back to my web developer, "Hey, can we do
24      something like that?"  I -- I think that that's a
25      higher level than "I want you to replicate that."
```

Page 154

1  This is exactly what I want.  I want Dorsey's
2  colors, I want Dorsey's logo, you know, you don't
3  need to copy their web page word for word, but that
4  gives you the gist.  Go to dorsey.com and make my
5  website look similar to that, look the same as
6  that.
7  Q  Okay.  Directing force does not mean that you have
8     seen any evidence to suggest that Mayo or CWS
9     copied source code from K2P, right?
10         MS. MUIRHEAD:  Objection, form.
11  Objection, asked and answered.
12         THE WITNESS:  I've seen no evidence of
13  the exfiltration of source code.
14         MR. EBNET:  Mr. Lanterman, I'm pretty
15  close.  Let's take a short break.  I'll review my
16  notes, and then hopefully we'll be close to being
17  done.
18         THE WITNESS:  Awesome, thanks.
19         THE VIDEOGRAPHER:  We are going off the
20  record at 1:57 p.m.  This concludes Media Unit
21  Number 3.
22         (A short recess was taken.)
23         THE VIDEOGRAPHER:  We are going back on
24  the record at 2:09 p.m.  This is the beginning of
25  Media Unit Number 4.

Page 155

1 BY MR. EBNET:
2 Q  Okay.  Mr. Lanterman, just a few additional
3    questions.  We had discussed this administrative
4    access concept.  Do you recall that?
5 A  Yes.
6 Q  And let me be more clear, we are discussing it in
7    terms of what CWS could or could not see on the K2P
8    platform.  Do you recall that?
9 A  Yes.
10 Q  And what I heard you say is that your understanding
11    of administrative access for purposes of this case
12    is based on the deposition transcript of Justin
13    McGinnis, is that right?
14         MS. MUIRHEAD:  Objection, form.
15         THE WITNESS:  Well, what I said was I
16  recall reading something describing the access
17  given to CWS and that I believed that that
18  something was the McGinnis transcript.
19 BY MR. EBNET:
20 Q  Certainly that something would be in the materials
21    that are listed in your report as being the
22    materials you reviewed, right?
23 A  Yes.
24 Q  Your understanding of what administrative access
25    means for purposes of this case is not being

Page 156

1     informed by anything outside of those materials you
2     have listed, right?
3 A  That's correct.
4 Q  Okay.  And you described to me earlier that you
5     were not in the room when CWS may or may not have
6     accessed the K2P platform, right?
7 A  That's correct.
8 Q  And so in terms of looking at whatever it is that
9     they saw if they did log on, you don't know what
10    that was?
11 A  That's correct.
12 Q  Okay.
13         MR. EBNET:  Those are all my questions,
14  Mr. Lanterman.  Thanks.
15         THE WITNESS:  Thank you.
16         MS. MUIRHEAD:  Thank you.  Nothing
17  further from us.
18         THE VIDEOGRAPHER:  We are going off the
19  record at 2:11 p.m., and this concludes today's
20  testimony given by Mark T. Lanterman.
21         MS. MUIRHEAD:  The usual, paperless, no
22  rough.
23         MR. EBNET:  Same.  We don't need a
24  rough, regular is fine.
25              *   *   *

Page 157

1 STATE OF MINNESOTA)
2                    ) SS.
3 COUNTY OF GOODHUE  )
4
5     Be it known that I took the deposition of MARK
6 LANTERMAN on the 9th day of March, 2023;
7     That I was then and there a notary public in
8 and for the County of Goodhue, State of Minnesota, and
9 that by virtue thereof; I was duly authorized to
10 administer an oath;
11     That the witness before testifying was by me
12 first duly sworn to testify to the truth and nothing but
13 the truth relative to said cause;
14     That the testimony of said witness was recorded
15 in computerized stenotype and thereafter transcribed by
16 myself, and that the testimony is a true record of the
17 testimony given by the witness to the best of my ability;
18     That I am not related to any of the parties
19 hereto nor interested in the outcome of the matter.
20
21 WITNESSED MY HAND AND SEAL THIS 20TH DAY OF MARCH, 2023.
22
23
24      *Lisa M. Hutton* (signature)
25         Lisa M. Hutton

40 (Pages 154 - 157)