# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Mayo Foundation for Medical Education and Research,

              Plaintiff/Counter Defendant,

v.

Knowledge to Practice, Inc.,

              Defendant/Counterclaimant.

Case No. 21-cv-1039 (SRN/TNL)

**\*FILED UNDER SEAL\*[1]**

**ORDER**

---

Alan J. Iverson, Andrew B. Brantingham, and Nathan J. Ebnet, Dorsey & Whitney LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402; and Payton E. George, Dorsey & Whitney LLP, 1401 New York Avenue Northwest, Suite 900, Washington, DC, 20005 (for Plaintiff/Counter Defendant Mayo Foundation for Medical Education and Research); and

Anthony R. Zeuli, Ariel O. Howe, Elisabeth Muirhead, and Gregory C. Golla, Merchant & Gould, 150 South Fifth Street, Suite 2200, Minneapolis, MN 55402 (for Defendant/Counterclaimant Knowledge to Practice, Inc.).

---

## I. INTRODUCTION

This matter comes before the Court on Defendant/Counterclaimant Knowledge to Practice, Inc.'s ("K2P") Motion to Compel, ECF No. 158, and Plaintiff/Counter Defendant Mayo Foundation for Medical Education and Research's ("Mayo") Motion to Compel, ECF No. 168.

---

[1] A number of documents were filed under seal in connection with these motions. In this Court's view, there is very little, if anything, in this Order that should remain under seal. The Court has, however, filed this Order under seal out of an abundance of caution in order to give the parties an opportunity to weigh in on whether there is a need for sealing. Accordingly, within 14 days from the date of this Order, the parties shall have met and conferred and filed a joint letter on the docket, specifying which, if any, portions of this Order should remain sealed and the basis therefor.

A hearing was held.  ECF No. 193.  Alan J. Iverson, Andrew B. Brantingham, and Donna Reuter appeared on behalf of Mayo.  Elisabeth Muirhead and Gregory C. Golla appeared on behalf of K2P.  Nathan Ebnet appeared on behalf of third party Corporate Web Services, Inc. ("CWS"), who is implicated in K2P's motion.

Based on information provided to the Court at the hearing and in light of the progress the parties appeared to be making towards resolving a number of issues on their own as well as their willingness to continue meeting and conferring, the Court directed the parties to continue their efforts and file a joint letter addressing the status of certain discovery.  *See generally* ECF No. 194.  The parties' efforts were not in vain.  As reflected in the joint letter and subsequent e-mail correspondence with the Court, the parties were able to resolve a significant amount of the discovery previously at issue on their own.  *See generally* ECF No. 198; *see also infra* nn. 2, 6.  The Court now turns to those issues that remain.

## II. BACKGROUND

This Order assumes familiarity with the background of this case as set forth in decisions issued by the presiding district judge.  *See, e.g.*, Memo. Op. & Order at 1-11, ECF No. 143; Order at 1-8, ECF No. 51.  Succinctly and broadly stated, this case involves a dispute over ownership of contractually-defined intellectual property interests in medical board review courses.

## III. ANALYSIS

### A.  Legal Standard

The parties' motions implicate the Court's broad discretion in handling pretrial

2

procedure and discovery. *See, e.g., Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 353 (8th Cir. 2020) ("A district court has very wide discretion in handling pretrial discovery . . . ." (quotation omitted)); *Solutran, Inc. v. U.S. Bancorp*, No. 13-cv-2637 (SRN/BRT), 2016 WL 7377099, at *2 (D. Minn. Dec. 20, 2016) ("Further, magistrate judges 'are afforded wide discretion in handling discovery matters and are free to use and control pretrial procedure in furtherance of the orderly administration of justice.'" (internal quotation marks omitted) (quoting *Favors v. Hoover*, No. 13-cv-428 (JRT/LIB), 2013 WL 6511851, at *3 n.3 (D. Minn. Dec. 12, 2013)).

In general, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). "Some threshold showing of relevance must be made[, however,] before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case." *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992). Further, "[t]he parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." *Vallejo v. Amgen, Inc.*, 903 F.3d 733, 742 (8th Cir. 2018) (quoting Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment); *see Lynch v. Experian Info. Sols., Inc.*, 569 F. Supp. 3d 959, 963 (D. Minn. 2021) ("Beyond being relevant, Rule 26 requires that information sought in discovery also be 'proportional to the needs of the case.'" (quoting Fed. R. Civ. P. 26(b)(1))), *aff'd*, 581 F. Supp. 3d 1122 (D. Minn. 2022). "[A] court can—and must—limit proposed discovery that it determines is not proportional to the needs of the case." *Vallejo*, 903 F.3d at 742 (quotation omitted);

*see* Fed. R. Civ. P. 26(b)(2)(C)(iii).  Considerations bearing on proportionality include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1); *see also Vallejo*, 903 F.3d at 742-43.

### B.  K2P's Motion

The sole remaining issue[2] in K2P's motion is to compel "Mayo[3] to produce unredacted versions of relevant CWS documents and Mayo documents."  K2P's Mem. in Supp. at 4, ECF No. 160.  Mayo asserts that these documents are shielded by the common-interest doctrine.[4]

### 1.  Governing Law as to Common-Interest Doctrine

In relevant part, Federal Rule of Evidence 501 states that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."  Fed. R. Evid. 501.  The claims in this case "rise and fall with the merits of [the parties'] breach of contract claims," namely, the 2018 Master Agreement.  Mem. Op. &

---

[2] At the hearing, the parties confirmed that the issue of access to the parties' respective courses was moot.  In the joint letter, K2P indicated that it was "satisfied with Mayo's supplemental production regarding financial information."  ECF No. 198 at 1.  And, in subsequent e-mail correspondence with the Court on May 10, 2023, the parties confirmed that they had also resolved the issues related to the deposition of CWS executive Alan De Keyrel. *Cf.* ECF No. 198 at 2.

[3] K2P requests that *Mayo* be ordered to produce "unredacted versions of relevant *CWS* documents."  K2P's Mem. in Supp. at 4 (emphasis added).  Notably, K2P has not explained how the documents of CWS—a third party—are in Mayo's possession, custody, or control.  *See* Fed. R. Civ. P. 34(a)(1).  Similarly, K2P has not articulated any sort of legal right Mayo has to the documents or practical ability to obtain them. *See, e.g.*, *In re Pork Antitrust Litig.*, No. 18-cv-1776 (JRT/HB), 2022 WL 972401, at *4 (D. Minn. Mar. 31, 2022); *Triple Five of Minn., Inc. v. Simon*, 212 F.R.D 523, 527 (D. Minn. 2002).  Ultimately, the Court need not reach this issue.

[4] CWS "joins in [Mayo's] opposition arguments related to the common interest doctrine."  CWS's Mem. in Opp'n at 2 n.1, ECF No. 177.

Order at 20 & n.10; *see also* Mem. Op. & Order at 7-8.  The 2018 Master Agreement states that it "will be governed by and construed and enforced in accordance with the laws of the State of Minnesota."  ECF No. 1-1 at 17; *see* ECF No. 16 (directing unsealing of Complaint and Exhibit A).  Accordingly, the Court looks to Minnesota state law as to the applicability of the common-interest doctrine.

The Minnesota Supreme Court recently recognized the common-interest doctrine in *Energy Policy Advocates v. Ellison*, 980 N.W.2d 146, 152 (Minn. 2022).  "[T]he common-interest doctrine . . . prevents privilege waiver in certain situations."  *Energy Policy Advocates*, 980 N.W.2d at 151.  "Ordinarily, parties waive the protection of the attorney-client privilege and the work-product doctrine when they disclose protected information to third parties."  *Id.* at 152.  "The common-interest doctrine, however, permits parties with the same legal interest to share documents without losing the protection of the attorney-client privilege or work-product doctrine."  *Id.*; *cf., e.g.*, *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 922 (8th Cir. 1997) (common-interest doctrine under federal law). As articulated in *Energy Policy Advocates*:

> in Minnesota, the common-interest doctrine applies when (1) two or more parties, (2) represented by separate lawyers, (3) have a common legal interest (4) in a litigated or non-litigated matter, (5) the parties agree to exchange information concerning the matter, and (6) they make an otherwise privileged communication in furtherance of formulating a joint legal strategy.

980 N.W.2d at 153.  "[T]he party asserting the protection of the common-interest doctrine has the burden of proving its application."  *Id.*

### 2. Existence of Common Legal Interest

The parties dispute whether Mayo and CWS share the requisite common legal interest. The requirement that two or more parties have a common *legal* interest "does not limit the [common-interest] doctrine to litigation"; "the common legal interest can be in a litigated or non-litigated matter." *Id.* "But a purely commercial, political, or policy interest is insufficient for the common-interest doctrine to apply." *Id.*

### a. Relationship of CWS to Mayo & This Litigation

"CWS is a web design and digital marketing agency." CWS's Mem. in Opp'n at 2. "CWS builds . . . websites that reflect the unique needs of each client." CWS's Mem. in Opp'n at 2. CWS is not a party to this action.

Mayo is a client of CWS. CWS's Mem. in Opp'n at 3. Among other services CWS performed for Mayo were the licensing, hosting, and development of an online learning platform known as MedEd Manager. *See, e.g.*, CWS's Mem. in Opp'n at 3; K2P's Mem. in Supp. at 5; Mem. Op. & Order at 3, 9. "Mayo engaged CWS to update the MedEd Manager platform to facilitate [the] presentation of . . . [certain cardiovascular subspecialty] courses" following its decision not to renew the contracts with K2P as to these courses. Mem. Op. & Order at 9; *see* Mem. Op. & Order at 6.

Mayo's launch of the cardiovascular subspeciality courses on the MedEd Manager platform brought about the deterioration of the relationship between Mayo and K2P. When "K2P learned of Mayo's intention to launch certain versions of the [c]ardiovascular [s]ubspeciality [c]ourses on the MedEd Manager platform," it "expressed concerns that Mayo had stolen" K2P's intellectual property and confidential information. Mem. Op. &

Order at 10.  "[D]espite K2P's requests that Mayo continue to delay launching the courses due to its concerns, Mayo launched certain versions of the [c]ardiovascular [s]ubspecialty [c]ourses on the MedEd Manager platform."  Mem. Op. & Order at 10.

"K2P purchased the courses as soon as they became available and, after review, concluded that the courses utilized K2P's competency-based personalized learning methodology."  Mem. Op. & Order at 10.  K2P continued to assert that the courses misused its intellectual property and confidential information.  Mem. Op. & Order at 10.  K2P also reviewed Mayo's access to K2P's online learning platform and found that its platform had been accessed by Mayo close to 1,500 times preceding the launch of the cardiovascular subspecialty courses on the MedEd Manager platform, causing K2P to believe that Mayo had purposely copied its intellectual property and confidential information.  Mem. Op. & Order at 10.

Allegations that CWS worked alongside Mayo in the alleged copying of K2P's online learning platform and courses and misappropriation of K2P's intellectual property and confidential information were present "when K2P first raised its concerns regarding Mayo's version of the [cardiovascular] subspecialty courses."  Mayo's Mem. in Opp'n at 3, ECF No. 180.  In correspondence, K2P commented that "[u]sing our product as their road map, and being able to actively be inside our product and see code exc. [sic] gave them a huge road map" and "[t]his was never anything . . . [Mayo] or CWS could have ever imagined let alone created without our product as a guide."  Ex. A to Decl. of Alan Iverson, ECF No. 181-1 at 2.

In connection with its counterclaims, K2P alleges that Mayo engaged CWS

7

"[b]efore launching its own online platform"; "CWS hosts and provides Mayo's online platform"; Mayo accessed K2P's online platform and courses "on multiple occasions for extended periods of time"; and Mayo disclosed K2P's intellectual property and confidential information "to CWS for the purpose of replicating" K2P's online platform and courses. K2P's Answer, Defenses & Countercls. ¶¶ 120-26, ECF No. 17. Indeed, even in connection with the instant motion, K2P asserts that "Mayo hired CWS to replicate the online platform and website to make the copied online courses available to the public." K2P's Memo. in Supp. at 2.

### b. Mayo and CWS Share a Common Legal Interest

Mayo asserts that "[it] and CWS have common legal interests in establishing the validity of Mayo's ownership of the intellectual property rights at issue and in defeating K2P's claim that they worked together to 'steal' K2P's intellectual property and copy [K2P's online platform]." Mayo's Mem. in Opp'n at 12. Mayo additionally asserts that, "[b]ecause K2P has characterized the nature of Mayo and CWS activity as a joint effort to steal its intellectual property and copy [K2P's online platform], [Mayo and CWS] have common legal interests in refuting that characterization, avoiding potential liability, and enforcing Mayo's contractual rights to offer its own versions of the courses in question." Mayo's Mem. in Opp'n at 13. K2P counters that CWS is not a party to this litigation and has "only a business interest, not [a] legal interest, in the dispute between K2P and Mayo." K2P's Mem. in Supp. at 7. K2P maintains that "CWS has not been accused of wrongdoing

with respect to Mayo's breach of contract . . . or unjust enrichment."[5]  K2P's Mem. in Supp. at 8.

Given CWS's undisputed involvement in facilitating the presentation of the at-issue cardiovascular subspeciality courses on the MedEd Manager platform—the very courses K2P alleges make use of and misappropriate its intellectual property and confidential information, the Court finds that Mayo and CWS share a common legal interest in defending against K2P's claims notwithstanding that CWS has not been named as a party in this action and that this common legal interest entitles their communications related to legal advice concerning course creation and intellectual property to protection under the common-interest doctrine.  *See Energy Policy Advocates*, 980 N.W.2d at 153; *cf. Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd.*, No. 14-cv-3103 (SRN/FLN), 2016 WL 11783857, at *6-7 (D. Minn. Mar. 29, 2016); *Khoday v. Symantec Corp.*, No. 11-cv-180 (JRT/TNL), 2013 WL 12140484, at *4 (D. Minn. Sept. 24, 2013); *Safeco Prods. Co. v. Welcom Prods., Inc.*, No. 08-cv-4918 (JRT/JJG), 2010 WL 11252007, at *3 (D. Minn. Feb. 10, 2010); *Tekstar Commc'ns, Inc. v. Sprint Commc'ns Co. L.P.*, No. 08-cv-1130 (JNE/RLE), 2009 WL 10711788, at *6 (D. Minn. May 14, 2009).  Accordingly, K2P's request that Mayo produce unredacted versions of certain documents and communications is denied.

---

[5] While K2P also includes a "breach of the duty of good faith and fair dealing," this counterclaim (Count III), K2P's Answer, Defenses & Countercls. ¶¶ 159-63, was previously dismissed.  Order at 13-14; *see also* Mem. Op. & Order at 12 n.8.

**C. Mayo's Motion**

The remaining issues in Mayo's motion to compel are additional deposition testimony from K2P and one request for production.[6]

**1. Additional Deposition Testimony from K2P**

Under Rule 30(b)(6), a party may name an organization as a deponent and then the organization must "designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf." Fed. R. Civ. P. 30(b)(6). The designee "must testify about information known or reasonably available to the organization." *Id.* "The Rule 30(b)(6) designee does not give his personal opinion. Rather, he presents the corporation's position on the topic. The designee testifies on behalf of the corporation and thus holds it accountable." *Bertrang v. Wi. Cent., Ltd.*, 301 F.R.D. 364, 367 (D. Minn. 2014) (quotation omitted). Accordingly, "the duty to prepare a Rule 30(b)(6) witness goes beyond matters personally known to the designee or to matters in which the designated witness was personally involved," and "requires the designee to testify about information known or reasonably available to the organization." *Klein v. Affiliated Grp.*, No. 18-cv-949 (DWF/ECW), 2019 WL 246768, at *9 (D. Minn. Jan. 17, 2019) (quotations omitted).

Rule 30(b)(6) "only operates effectively when the requesting party specifically designates the topics for deposition, and when the responding party produces such number

---

[6] In the joint letter, Mayo indicated it was satisfied with K2P's document production except as to Requests for Production Nos. 13 and 19; was satisfied with K2P's supplemental interrogatory answer regarding damages; and was satisfied with K2P's redesignation of certain documents and testimony to remove the attorneys'-eyes-only designation. ECF No. 198 at 3-4. The parties later confirmed in the May 10 e-mail that Request for Production No. 13 had also been resolved. *Cf.* ECF No. 198 at 4.

of persons as will satisfy the request, and prepares them so that they may give complete, knowledgeable and binding answers on behalf of the [organization]." *Dwelly v. Yamaha Motor Corp.*, 214 F.R.D. 537, 540 (D. Minn. 2003) (quotation omitted); *see also, e.g.*, *Klein*, 2019 WL 246768, at *9. Thus, "the responding party, having been specifically notified as to the specific areas of exploration, is obligated to produce a deponent who has been suitably prepared to respond to questioning within that scope of inquiry." *Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 638 (D. Minn. 2000); *see also, e.g.*, *Klein*, 2019 WL 246768, at *9. "To this end, the responding party must make a conscientious, good-faith effort to designate knowledgeable persons for Rule 30(b)(6) depositions and to prepare them to fully and unevasively answer questions about the designated subject matter." *Dwelly*, 214 F.R.D. at 540 (quotation omitted); *see also, e.g.*, *Klein*, 2019 WL 246768, at *9.

"That being said, Rule 30(b)(6) designees need not be 'perfect'; designees are responsible for information known or reasonably available to the corporation." *Bombardier Recreational Prods., Inc. v. Artic Cat, Inc.*, No. 12-cv-2706 (MJD/LIB), 2014 WL 10714011, at *10 (D. Minn. Dec. 5, 2014) (quotation omitted); *see also, e.g.*, *Klein*, 2019 WL 246768, at *9; *Mallak v. Aitkin Cty.*, No. 13-cv-2119 (DWF/LIB), 2016 WL 8607391, at *7 (D. Minn. June 30, 2016). "Broad topics of inquiry do not give rise to an obligation to prepare a witness to answer every conceivable detailed question relating to the topic." *Bombardier Recreational Prods.*, 2014 WL 10714011, at *10. "[A]s a practical matter[,] the Rule 30(b)(6) deponent is not expected to be clairvoyant, so as to divine the specific questions that could be presented." *Id.* (quotation omitted); *see also, e.g.*, *Klein*,

11

2019 WL 246768, at *9; *Mallak*, 2016 WL 8607391, at *7.

"Where a corporation fails to designate an appropriate witness, or where that witness is not adequately prepared to testify to specific topics, then a party may compel the corporation to supply a substitute designee." *Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, No. 05-cv-2310 (DSD/JJG), 2007 WL 9734818, at *3 (D. Minn. Jan. 4, 2007).

There is no dispute that K2P did not object to any of the topics in the 30(b)(6) notice. Mayo's Mem. in Supp. at 5-6, ECF No. 170; K2P's Mem. in Opp'n at 5, ECF No. 184. K2P designated Mary Ellen Beliveau as its 30(b)(6) designee. Decl. of Mary Ellen Beliveau ¶ 9, ECF No. 185; *see generally* Exs. A (deposition of Beliveau in her individual capacity and as 30(b)(6) designee) [hereinafter Beliveau I Dep.], B (deposition of Beliveau as 30(b)(6) designee) [hereinafter Beliveau II Dep.] to Decl. of Anthony R. Zeuli, ECF Nos. 187, 187-1. Beliveau is K2P's founder and CEO. Beliveau ¶ 1. Beliveau was also deposed in her individual capacity. Beliveau Decl. ¶ 9; *see generally* Beliveau I Dep. The individual and corporate depositions of Beliveau took place over two consecutive days. Beliveau Decl. ¶¶ 9, 11. In total, Beliveau testified for approximately 14 hours. Beliveau Decl. ¶ 11.

### a.  Topic No. 12: Unauthorized Access

Topic No. 12 sought testimony regarding "[a]ny log, data, Document, facts, or evidence related to any alleged unauthorized access by Mayo personnel of the K2P Platform or any K2P property." Ex. M to Decl. of Alan Iverson, ECF No. 171-1 at 71.

Mayo asserts that "Beliveau was unable to testify regarding Mayo's alleged

unauthorized access to" K2P's online platform.  Mayo's Mem. in Supp. at 6.  According to Mayo, when Beliveau was specifically asked "about documents or data that showed unauthorized access by Mayo personnel of the K2P platform[,] she responded that she would have to ask" Kara Sasse,[7] a former K2P employee.  Mayo's Mem. in Supp. at 6 (quotation omitted); *see* Beliveau I Dep. 9:16, 13:17-14:3.  Mayo similarly asserts that Beliveau was "unable to explain the data contained in a purported access log" and again referred to Sasse as the person with knowledge.  Mayo's Mem. in Supp. at 6 (quotation omitted).  Beliveau also "admitted that she had not met with [Sasse] or anyone else" aside from counsel in preparation for her testimony.  Mayo's Mem. in Supp. at 6 (quotation omitted).  Mayo additionally asserts that Beliveau "repeatedly testified that she either was not sure or did not know" the answer to Mayo's questions regarding alleged unauthorized access.  Mayo's Mem. in Supp. at 6-7 (quotation omitted).

The Court has reviewed the deposition testimony in question regarding Topic No. 12.  *See generally* Beliveau II Dep. 286:4-297:10.  The Court disagrees with Mayo's assertion that "Beliveau was unable to answer basic questions regarding the supposed unauthorized access by Mayo personnel."  Mayo's Mem. in Supp. at 17.  Among other things, Beliveau testified that there were documents showing unauthorized access and explained that the data had been provided to her through executive summaries and reports.  *See, e.g.*, Beliveau II Dep. 287:16-288:9, 289:11-290:8.  Beliveau testified to the existence of data logs showing that, at the time K2P discovered Mayo's alleged copying, individuals

---

[7] Sometimes, Sasse's first name is incorrectly spelled as "Cara."  *See, e.g.*, Beliveau II Dep. 288:5.

were "suddenly in [K2P's] system where they had never before [sic] and showed patterns of prior years versus current years."  Beliveau II Dep. 289:17-22.  Beliveau was able to identify a data log from K2P and confirmed that this was the type of data that was the subject of the "summary report" to which she had referred earlier.  Beliveau II Dep. 290:13-22.  While Beliveau was not able to speak in great detail about what each of the columns on the log meant, she was overall able to respond more generally about them.  *See* Beliveau II Dep. 291:1-293:9.  Beliveau was also able to answer questions about whether certain types of information—such as whether any data or information was downloaded during the access or whether the access occurred on the "administrative side versus the non-administrative side"—were contained in the particular log.  *See* Beliveau II Dep. 293:10-294:17.  The Court concludes that Beliveau was reasonably prepared for Topic No. 12 and the fact that she "was not able to answer some questions . . . does not in [and] of itself demonstrate [that s]he was entirely unprepared to testify about information that was or reasonably should have been known by [K2P]" regarding Topic No. 12, particularly in light of the 34 topics noticed by Mayo.  *See Klein*, 2019 WL 246768, at *9.  Accordingly, Mayo's motion is denied as to Topic No. 12.

### b.  Topic No. 17: Damages

Topic No. 17 sought testimony regarding "[a]ll damages that K2P claims in this lawsuit."  Ex. M to Iverson Decl., ECF No. 171-1 at 72.

Mayo asserts that Beliveau was not able "to provide specific testimony regarding the factual bases for K2P's damages," focusing on places where Beliveau was unable to quantify certain damages or provide calculations and was unable to recall certain details,

like the time frame for which K2P is claiming lost profits.  Mayo's Mem. in Supp. at 7; *see*
Mayo's Mem. in Supp. at 7-8.  Acknowledging that K2P's "damages calculations may
evolve" and that it "would not necessarily expect a 30(b)(6) witness to speak to these issues
with perfect mathematical precision," Mayo asserts that Beliveau was "unable to articulate
even basic facts related to K2P's damages theories."  Mayo's Mem. in Supp. at 19.

As stated above, a Rule 30(b)(6) designee need not be perfect.  *See Klein*, 2019 WL
246768, at \*9; *Mallak*, 2016 WL 8607391, at \*7; *Bombardier Recreational Prods.*, 2014
WL 10714011, at \*10.  And again, the fact that Beliveau may not have been able to answer
some questions does not in and of itself demonstrate that she was wholly unprepared testify.
*See Klein*, 2019 WL 246768, at \*9.  Having reviewed the testimony in question, the Court
does not agree with Mayo's assertion that Beliveau was "unable to articulate even basic
facts related to K2P's damages theories."  Mayo's Mem. in Supp. at 19.  For example,
Beliveau testified in considerable detail about the investment K2P contends Mayo
destroyed through the alleged copying of K2P's online platform, including the component
"categories" of that investment, how those amounts were obtained, and the facts supporting
K2P's contention that Mayo destroyed that investment.  *See, e.g.*, Beliveau II Dep. 154:13-
161:19.  She also testified to facts supporting K2P's contention that it was damaged by
Mayo through the alleged blocking of K2P's ability to raise capital, theft of K2P's customer
list, theft of K2P's Google AdWords, and creation of a new competitor in CWS by sharing
K2P's confidential information.  *See, e.g.*, Beliveau II Dep. 172:8-177:8, 178:1-179:15,
179:16-185:21, 186:12-187:22.  True, Beliveau was not able to answer some questions.  At
the same time, using the "enterprise value" line of inquiry as an example, it cannot be said

15

that she was wholly unprepared.  *Compare, e.g.*, Beliveau II Dep. 166:4-8, 169:8-10 *with* Beliveau II Dep. 169:11-172:7.  Therefore, the Court also concludes that Beliveau was reasonably prepared for Topic No. 17 and Mayo's motion is denied with respect to this topic.

### c. Topic No. 22: Features & Functionality of K2P's Online Platform

Topic No. 22 sought testimony regarding "[t]he functionality and development of the K2P Platform, including the source(s) or development of any software or computer code incorporated in current or prior versions of the K2P Platform, and any agreements, licenses, partnerships, or other relationships with any third party involved in development or operation of the K2P Platform."  Ex. M to Iverson Decl., ECF No. 171-1 at 72-73.

Mayo asserts that Beliveau's unpreparedness as to Topic No. 22 is evidenced in her testimony that she would need to "rely on [her] product and engineering team" when she was "asked to explain the features and functions of the K2P platform that facilitate and permit personalized learning."  Mayo's Mem. in Supp. at 9 (quotation omitted).  Mayo additionally asserts that Believe was unable to answer questions "about the cross-linking that enables [the] personalized learning" model K2P alleges embodies its confidential information and intellectual property.  Mayo's Mem. in Supp. at 9; *see* Mayo's Mem. in Supp. at 19.

Mayo's complaints sound in the technical.  Mayo states that testimony regarding Topic No. 22 is "necessary to understand how K2P's technology is proprietary and how Mayo could not have derived a similar product but for copying it, as K2P claims."  Mayo's

Mem. in Supp. at 19. Yet, during the deposition, Mayo specifically stated it was not looking for these sort of technical details:

> Q:    Can you just tell me, what is the cross-linking that enables personalized learning? What is being cross-linked?
>
> A:    I would ask for, you know, my product team and engineering team to get specific on that.
>
> Q:    And that is not something you did to prepare to testify on this topic today?
>
> A:    No.
>
> Q:    Okay. So when you signed this interrogatory answer, did you not know what the cross-linking that enables personalized learning actually is?
>
> A:    No. I know what it is. That is different than how it's actually done from a code perspective.
>
> Q:    *And I'm not asking about code.* I am asking what is being cross-linked. What is being linked to what?
>
> A:    The learner's experience to content and assessments.

Beliveau II Dep. 119:1-19 (emphasis added).

Indeed, it takes a little bit of digging to appreciate that the "topic" being referred to above is not Topic No. 22 at all. The testimony that Mayo asserts shows Beliveau was unprepared with respect to Topic No. 22 is actually from a line of questioning in connection with Topic Nos. 2 through 7 and Interrogatory No. 2. *See* Beliveau II Dep. 101:20-102:6, 102:18-21, 103:20-104:2, 104:22-105:2; *see generally* Beliveau II Dep. 101:20-121:9. These questions were focused on the broader topics of K2P's alleged content, intellectual property, instructional design, and confidential information in the courses at issue. *See*

*generally* Beliveau II Dep. 101:20-121:9. It was close to 75 pages *later* when Mayo turned

to Topic No. 22. Beliveau II Dep. 194:10-12 ("Okay. Topic 22 relates to the development

of the K2P platform, and I would like to ask some questions about that."). Beliveau

provided detailed testimony regarding the development of K2P's online platform for the

next 40 or so pages—none of which Mayo takes issue with here. *See generally* Beliveau

II Dep. 194:10-236:5; *see also, e.g.*, Beliveau II Dep. 26:7-37:5, 51:12-52:20. Mayo's

motion is likewise denied as to Topic No. 22.

### d. Documents Referenced in Beliveau's Deposition

Lastly, Mayo asserts that Beliveau "referenced a number of documents during her

testimony that have not been produced," and moves for an order compelling K2P to

produce those documents. Mayo's Mem. in Supp. at 20.

Rule 37 of the Federal Rules of Civil Procedure states that "[a] party seeking

discovery may move for an order compelling . . . production" if "a party fails to produce

documents . . . as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B), (iv). It is Mayo's

position that "having failed to produce th[e subject] documents prior to the deposition, K2P

precluded Mayo from asking [Beliveau] about the documents." Mayo's Mem. in Supp. at

20. But, for the majority of the documents requested, Mayo has not expressly articulated

for the Court to which prior Rule 34 requests for production served by Mayo the subject

documents were purportedly responsive.[8] Nor has Mayo tied its demand for the subject

---

[8] To the extent Mayo's memorandum can be read as implying that certain documents are responsive to Request for Production Nos. 13 and 19, *see* Mayo's Mem. in Supp. at 22, such documents were not cited by Mayo as a basis for asserting that K2P's production in response to Request for Production No. 13 was deficient, *compare* Mayo's Mem. in Supp. at 25 (discussing Request for Production No. 13) *with* Mayo's Mem. in Supp. at 27-28 (discussing Request for Production No. 19). In any event, the parties have since resolved their dispute as to both Request for Production

documents to a specific request made under Rule 34 following the deposition seeking their production.  Likewise, Mayo has not provided any authority that a party may seek and move to compel the production of documents in this manner.

Having not connected the instant request to compel production with a proper request demanding such production, Mayo's motion is thus denied as to its request that K2P be compelled to produce certain documents Beliveau referenced during her deposition.

### 2.  Request for Production No. 46

Request for Production No. 46 seeks "[a]ll documents and discovery served, filed, or produced (including but not limited to deposition transcripts) in the action captioned as *Hampden Lane Project, LCC v. Knowledge to Practice, Inc.*, C-15-CV-22-00968 pending in the Circuit Court for Montgomery County, Maryland, Civil Division."  Ex. F to Iverson Decl., ECF No. 171-1 at 44.  K2P objects to Request for Production No. 46 as irrelevant.

The Maryland lawsuit involves non-payment of rent by K2P.  Beliveau I Dep. 24:16-22:14.  Mayo states that K2P's "landlord has obtained a default judgment against K2P and Mayo has been named as a garnishee in that action."  Mayo's Mem. in Supp. at 31.  Mayo asserts that it was named "presumably because K2P informed [its] judgment creditor that Mayo owes K2P money" and "[t]h[is] alone entitles Mayo to receive evidence of K2P's representations in that case."  Mayo's Mem. in Supp. at 31.  Mayo asserts that it should be able to review K2P's deposition "for any statements that may bear upon" the instant action.  Mayo's Mem. in Supp. at 31-32.  Mayo further asserts that "documents

Nos. 13 and 19.  *See supra* n.6.

from the Maryland lawsuit are relevant to K2P's financial status and the go-forward viability of K2P as a business," which relate to "K2P's damages claims for lost profits and lost enterprise value" as well as its claim "that Mayo has frustrated its ability to raise capital from investors."  Mayo's Mem. in Supp. at 32.

K2P counters that information responsive to Request for Production No. 46 is irrelevant and amounts to a fishing expedition.  K2P points out that the Maryland case concerns events taking place three years after the events in question in the instant litigation and contends that the notion that documents in the Maryland case "may contain something indicative of K2P's expectation of future profits, its enterprise value, and/or its ability to raise capital at the time Mayo breached and as a result of that breach makes no sense." K2P's Mem. in Opp'n at 17-18.

Mayo's motion is denied as to Request for Production No. 46.  On balance, the Court finds that Request for Production No. 46 is not proportional to the needs of this case in light of the marginal relevance that information contained in litigation with a former landlord over a lease is likely to have to the claims and defenses in this case and such information's tangential value to resolution of the parties' dispute.  Fed. R. Civ. P. 26(b)(2)(C)(iii); *see* Fed. R. Civ. P. 26(b)(1); *Vallejo*, 903 F.3d at 742.

### D.  Attorney Fees & Costs

The Court has denied the parties' respective motions as to the discovery remaining in dispute.  Rule 37 of the Federal Rules of Civil Procedure states that, when a motion to compel is denied, the Court "must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed

20

the motion its reasonable expenses incurred in opposing the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(B). Rule 37 further provides, however, that "the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust." *Id.*

It is this Court's view that any award of attorney fees and costs would have little if any positive effect, and would serve only to embolden further the recipient party, entrench the parties in their respective positions, and increase the costs of this litigation, making an award of fees unjust under the circumstances. Accordingly, each party shall bear its own costs and attorney fees in connection with the instant motions.

## IV. ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. K2P's Motion to Compel, ECF No. 158, is **DENIED**.

2. Mayo's Motion to Compel, ECF No. 168, is **DENIED**.

3. Each party shall bear its own costs and attorney fees in connection with these motions. *See* Fed. R. Civ. P. 37(a)(5)(B).

4. **Within 14 days from the date of this Order**, the parties shall have met and conferred and filed a joint letter, specifying which if any portions of this Order should remain sealed and the basis therefor.

5. All prior consistent orders remain in full force and effect.

6. Failure to comply with any provision of this Order or any other prior consistent Order shall subject the non-complying party, non-complying counsel and/or the party such counsel represents to any and all appropriate remedies, sanctions and the like, including without limitation: assessment of costs, fines and attorneys' fees and disbursements; waiver of rights to object; exclusion or limitation of witnesses, testimony, exhibits and other evidence; striking of pleadings;

complete or partial dismissal with prejudice; entry of whole or partial default judgment; and/or any other relief that this Court may from time to time deem appropriate.


Dated: May___11___, 2023                        _____s/ Tony N. Leung_____
                                                Tony N. Leung
                                                United States Magistrate Judge
                                                District of Minnesota


                                                *Mayo Foundation for Medical Education & Research v. Knowledge to Practice, Inc.*
                                                Case No. 21-cv-1039 (SRN/TNL)

22